[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 6, 2010
JOHN LEY
ACTING CLERK

No. 07-10808

_____

D. C. Docket No. 06-00376-CV-KD-M

DEWAYNE S. CUNNINGHAM,

Plaintiff-Appellant,

versus

DISTRICT ATTORNEY'S OFFICE
FOR ESCAMBIA COUNTY,

Defendant,

STEPHEN M. BILLY,
TOWN OF FLOMATON, A
Municipal Corporation,
ATTORNEY GENERAL, TROY KING,
CHIEF OF POLICE, MICHAEL LAMBERT,
CIRCUIT COURT CLERK, JAMES TAYLOR,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(January 6, 2010)

Before BLACK and CARNES, Circuit Judges, and RESTANI,[*] Judge.

CARNES, Circuit Judge:

Dewayne S. Cunningham is an Alabama prisoner serving a life sentence after having been convicted in 1996 of rape in the first degree. A decade after he was convicted, eight years after his conviction became final at the end of the direct appeal process, and following more than half a dozen separate attacks on his conviction in state and federal court, Cunningham filed a 42 U.S.C. § 1983 lawsuit. This lawsuit, brought on Cunningham's behalf by the Wisconsin Innocence Project, seeks an order requiring Alabama authorities to send certain evidence to a forensic laboratory of Cunningham's choice for DNA testing. He hopes that the results will show that he is innocent.

The district court dismissed Cunningham's § 1983 complaint for failure to state a claim as to those defendants who had not filed an answer and granted judgment on the pleadings for those defendants who had filed an answer. This is Cunningham's appeal from that judgment.

## I. Facts

The evidence presented at the 1996 trial in which Cunningham was

---

[*] Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

convicted of rape provides critical context to his contention that he is factually innocent and affects the load-bearing capacity of that contention as a vehicle for the legal freight he would have it carry. The evidence, which we will set out in detail, establishes beyond a shadow of a doubt that Cunningham suffers from serious mental problems that resulted in his being confined in institutions for much of his life and that caused him to engage in some grossly inappropriate behavior. His sexual assault of a woman while he was confined in a mental institution in 1986 did not result in prosecution, but what he was accused of doing to another woman in 1995 while outside a mental institution resulted in a charge of rape in the first degree.

To that charge Cunningham pleaded not guilty and not guilty by reason of insanity. As a result of his dual plea, the trial was bifurcated. During the first stage the jury heard evidence on the question of whether Cunningham had committed the rape and returned a verdict finding that he had. Then, at the second stage of the trial, evidence about Cunningham's extensive history of mental health problems was presented in order for the jury to determine his mental state at the time of the rape. After hearing that evidence, the jury returned a second verdict rejecting Cunningham's plea of not guilty by reason of insanity. We will set out the facts more or less in the order they actually occurred.

## A. Cunningham's Psychiatric History

In 1983, when he was thirteen, Cunningham was hospitalized for two months in Mesa Vista Hospital, a mental health institution in San Diego, after he had, according to a later report, "exposed himself, and was talking about cutting off his penis." (R2:210). While there, he was diagnosed as having chronic undifferentiated schizophrenia (id.), which involved "significant episodes of a breakdown in his thinking processes" and which prevented "think[ing] in a logical rational manner." (R12:752). An individual with that diagnosis has a "thinking and emotional state [that] does not correspond to reality," and he often does "not react to various life circumstances as a normal person would react." (Id.)

After Cunningham was discharged from Mesa Vista Hospital, he was transferred to MacLaren Hall, another facility, to await placement. (R2:211). While there Cunningham engaged in some bizarre behavior, described in the records as follows: "[H]e removed his clothing, urinated on the floor, put his finger which was contaminated with urine into his mouth. He inserted the same finger into his anus, then took it out and put it in his mouth." (Id. at 211). Dr. Terence W. Campbell, a forensic psychologist who testified on Cunningham's behalf at the trial, later noted in his report that someone who engages in that sort of behavior "quite obviously is a very disturbed individual." (Id.) Dr. Campbell

4

testified that bizarre behavior of that type is very rare and that he could remember having observed only three or four episodes like it in his entire career and those were by "exceedingly disturbed, very psychotic inmates" most of whom were in a penitentiary. (R12:754).

During the same month as that bizarre incident, hospital personnel at MacLaren Hall also had to restrain Cunningham because of his "loss of behavioral control." (R2:211). Cunningham made it so difficult for staff to apply the restraints, however, that his arm was broken in the struggle. (Id.)

Later that same year, Cunningham was admitted to Camarillo State Hospital in California at the age of fourteen,[1] and he remained there until he was eighteen or nineteen years old.[2] (See id. at 211–13). Records from that institution indicate that by age fourteen Cunningham had suffered a grand mal seizure and had been diagnosed as having an idiopathic seizure disorder. (Id. at 211). Later that year one doctor at Camarillo State Hospital diagnosed Cunningham, who was then

---

[1] The report of one doctor at Camarillo State Hospital indicates that at some time previously Cunningham had been admitted to the hospital in the Children's Program for eight months. (Id. at 212). According to that report, Cunningham's treating physician during the earlier period of confinement had diagnosed him with chronic schizophrenia. (Id.)

[2] The available mental health records are unclear about the exact date that Cunningham was discharged from Camarillo State Hospital. However, he must have been a resident there until at least June 13, 1988 because hospital records for that date indicate that he had a seizure in the hospital. (Id. at 213).

5

fifteen years old, with "Schizophrenia, Undifferentiated." (Id. at 212). According to that doctor's psychiatric evaluation, Cunningham had "a history of short periods of psychotic decompensation in which he hears voices and behaves in an irrational manner. This is interspersed with episodes of very good behavior and a high level of performance." (Id. at 211–12). The report further noted that Cunningham seemed to do well while medicated but that he reported hearing voices at night when he was not taking his medication. (Id. at 212).

Dr. Campbell testified that these reports from Cunningham's early hospitalizations establish that "he experienced auditory hallucinations provoking irrational behavior." (Id.) Although Cunningham's psychotic behavior could be effectively controlled with medication at that time, Dr. Campbell noted that without "institutional influences, mentally ill people can indulge their own impulsiveness and poor judgment in the community in a manner that leads to serious problems." (Id.) According to him, Cunningham "responded in just this manner." (Id.)

Another psychiatrist who evaluated Cunningham during his lengthy stay at Camarillo State Hospital disagreed with the earlier schizophrenia diagnosis for a number of reasons, one of which was that he found Cunningham's story about hallucinations "not very convincing." (Id.) That psychiatrist nonetheless

diagnosed Cunningham as psychotic ("Atypical Psychosis") and as having a "Conduct Disorder, Undersocialized, Aggressive." (Id.) Cunningham was just under sixteen years old at the time of that evaluation. As Dr. Campbell later noted at trial, all of the psychiatrists who treated Cunningham at this stage of his life agreed that he was psychotic, although there was some disagreement on the specific type of psychosis. (R12:765–66).

In 1986, when Cunningham was seventeen years old and still institutionalized at Camarillo State Hospital, he sexually assaulted a female music therapist who was interning at the institution. (R2:213). He physically attacked the intern, forced her to the ground, and ripped open the front of her blouse so he could fondle her breasts. (Id.) During the struggle, Cunningham told the intern that he had a knife in his back pocket and would kill her if she did not submit to him. (Id.) The intern escaped only after her screams brought another man to the area, causing Cunningham to run away. (Id.) Although Cunningham eventually acknowledged his involvement in the attack, he explained his behavior by claiming that he and a friend had taken some "acid" earlier, which caused him to hallucinate that voices were telling him that the intern was a mannequin that had stolen his mother's clothing. (Id.) The struggle, Cunningham explained, was merely his attempt to get the clothing back. (Id.) Cunningham's story did not

7

explain why he had felt it necessary to fondle the breast of the "mannequin," or to threaten it with a knife. Dr. Defrancisco, the State's psychiatrist, noted at trial that the fact that Cunningham ran when he heard someone coming indicated "he had some consciousness of what he was doing" when he assaulted the intern. (R13:847–48).

Dr. Campbell's report concluded that this incident "establishes that Mr. Cunningham has a history of sexual assaultiveness" that involves "psychotic decompensation." (R2:213). In his words, "[t]o belabor the obvious, [this] is indicative of a seriously disturbed individual." (Id.) Dr. Campbell further noted that using later diagnostic criteria, Cunningham's condition at the time he sexually assaulted the young intern "would have been diagnosed as a Substance-Induced Psychotic Disorder." (Id.)

When he was seventeen or eighteen years old, Cunningham "was declared a conservator" of the State of California "through the diagnosis of being gravely mentally ill or disabled." (R2:221). By the time he was nineteen years old, Cunningham had been admitted to Foothill Hospital, another California mental health institution. (See id. at 213). Two psychiatrists at that facility evaluated Cunningham's legal competency and responsibility. (Id.) They diagnosed him with "chronic schizophrenia" that was controlled at the time by an "ample dose of

8

psychotropic medication, but until recently [he] was agitated, violent and unpredictable." (Id. at 213–14). Those two psychiatrists concluded that Cunningham was not competent to care for his own basic needs, and he was incapable or unwilling to accept voluntary treatment "because of his chronic psychosis, poor judgment, and lack of understanding" as well as his belief that "nothing [was] wrong with himself." (Id. at 214). Some months after being admitted to Foothill Hospital, Cunningham was discharged from that institution. He was prescribed medications including Dilantin for seizure disorders and Haldol and Lithium to prevent him from going back into a psychotic condition. (Id.; R12:773–74).

After being discharged from Foothill Hospital at the age of nineteen, Cunningham lived on the streets and hopped freight trains from state to state and place to place. (R2:214, 222). He drew Supplemental Security Income benefits (SSI) of about $720 per month, which were apparently sent to a mailing address he maintained in California. (Id.) While on the road (or rails) Cunningham stayed at various crisis centers in Utah, Wyoming, and Florida. (Id.) His criminal history during that period includes an arson charge and a possession of cocaine for sale charge in Miami, as well as numerous misdemeanors including indecent exposure. (Id.)

Between the ages of nineteen and twenty-one, Cunningham was hospitalized in an Oklahoma psychiatric facility "and possibly other facilities." (R2:214). At age twenty-one, he was admitted to Jackson Memorial Hospital in Miami after threatening to harm himself and overdosing on Dilantin, an anti-seizure medication, that he had hoarded until he amassed a dose that was large enough to be potentially fatal. (Id.; R12:775).

At age twenty-two Cunningham was again admitted to Jackson Memorial Hospital as a result of a social worker's report that Cunningham was depressed and had been cutting his wrists with an aluminum can, in his words, "to take the pain away from [his] heart." (R2:214). The hospital records from that admission note that Cunningham had a history of four previous suicide attempts and was "[p]ositive for persecutory delusions."[3] (Id. at 214–15). The records also indicate that he was "positive for marijuana use since age fourteen; last used three days ago." (R12:776–77).

On August 21, 1992, Cunningham was admitted to the Miami hospital a third time because he had intentionally cut his wrist with a piece of broken glass. (R2:215). He was put into four-point restraints "for protection of self and others."

---

[3] The report of Dr. Robert Defrancisco, a clinical psychologist who testified for the State at Cunningham's trial, indicates that Cunningham "had numerous . . . suicide attempts, over 20, by taking pills, superficially slashing his wrists as well." (R2:222).

(Id.)  During this third stay at Jackson Memorial Hospital, Cunningham was spitting, banging his head with the wrist restraints, and was "verbally abusive, hostile, [and] uncooperative, stating 'I want you to hurt me.'" (Id.)

## B.  The Rape

On August 20, 1995—the day that Alicia Nicole Brown was attacked—Cunningham recalls getting off the train in Flomaton, Alabama at approximately 11:15 a.m.  (Id. at 226).  According to Brown's testimony at trial, she had gone to the park that morning to go jogging.  (R11:600).  While there, she was grabbed by her attacker, who held a knife to her stomach and demanded that she go into the woods with him.  (R:12:601–02).  The man told Brown "that he just wanted to make love to [her] and that was all and as long as [she] did what he said . . . [she] would be okay."  (Id. at 602).

Brown begged her attacker not to hurt her and to let her go.  (Id.)  In an effort to stall him, she then convinced the man to sit down and talk to her.  (Id.)  Brown began asking the man questions concerning his name and where he was from.  (Id. at 602–03).  After he responded that his name was "William" and that "he was not from around there," she proceeded to tell her attacker her own name and describe how she had just graduated from college and had recently started teaching.  (Id. at 603).  Although Brown could tell her attacker was becoming

11

impatient, she was able to persuade him to set down his knife. (Id.) She even successfully convinced him to get up and lay the knife down further away from where the two were sitting on the ground. (Id.)

When her attacker realized that Brown still did not want to go with him, he grabbed her arms and started pulling her towards the woods. (Id. at 604). Brown managed to break loose from him at that point and tried to run away. (Id.) However, the man eventually caught up to Brown and pulled her back to the ground. (Id.) Brown was then able to convince her attacker to walk with her to the press box area of the park where she thought someone might see them because it was closer to the road. (Id. at 604–05). As they walked, Brown asked the man if he was having a lot of problems or if he did not realize what he was doing. (Id. at 605). When he told her he wanted to make love to her and that he had a condom, she panicked. (Id.) Brown managed to escape from him yet again, but the man eventually grabbed her ponytail and tackled her from behind. (Id. at 605–06) Angered by her repeated attempts to escape, the man told Brown that he would kill her if she tried to get away again. (Id. at 606). He then pulled down Brown's shorts, put on a condom, and pinned down her arms while he raped her. (Id. at 606–07).

Following the brutal attack, Brown tried to avoid further harm by asking her

12

rapist when she would be able to see him again. (Id. at 608). After a brief discussion, Brown put her clothes on and walked back towards the track she been jogging on, got in her truck, and drove directly to the Flomaton Police Department. (Id. at 608–09). When she arrived at the police station, Brown told a dispatcher and Officer Jeff Joyner that she had been raped and described her attacker as wearing black pants[4] but no shirt, and as having dirty blonde hair. (R1:134; R:12:615).

## C. The Arrest and Identifying Evidence

Officer Joyner immediately headed towards the park to investigate. (R11:496). On his way there, Joyner saw Cunningham, who was shirtless, wearing blue sweat pants, and carrying a backpack, walking towards town along the highway adjacent to the park. (Id. at 522; R1:123–24). Joyner stopped and asked Cunningham if he had seen anything unusual at the park or had taken part in any confrontations that morning. (R11:498). After Cunningham responded in the negative, Joyner asked him to wait by the side of the road. (Id.) At that point, Joyner left Cunningham and drove through the park for several minutes to look for

---

[4] At a suppression hearing before trial, Brown described her attacker as wearing "black pants," but testified that she thought "they were corduroy." (R1:134). At trial, however, Officer Joyner testified that when Brown came to the police station on the day of the rape, she said that her attacker had been wearing "black jeans." (R11:495).

13

other potential suspects. (Id. at 499, 530–31). Not seeing anyone in the park, Joyner returned to where Cunningham was still waiting on the side of the highway and took him into custody, explaining that he fit the description of a suspect Joyner was looking for. (Id.) Joyner frisked Cunningham before placing him in the police car, but found only a pack of cigarettes and a lighter that Cunningham had in his hands. (Id. at 535).

Officer Joyner then took Cunningham back to the police station and left him in the backseat of the police car while he went inside to talk to Brown. (Id. at 501–02). Joyner told Brown that he had a suspect in custody and asked her to come outside to see if she could identify the man as her attacker. (Id. at 502 Brown walked outside of the police station and identified Cunningham, who was seated in the backseat on the driver's side of the police car with the windows rolled up, as the man who had raped her.[5] (R1:128; R11:502, 544).

Chief of Police Lacy Wilkerson then took Brown to McMillan Hospital, where a sexual assault examination was performed. (R3:439–46; R11:424). William H. Jones, a forensic biologist for the Alabama Department of Forensic

---

[5] There was conflicting testimony as to how far Brown was standing from the police car at the time she identified Cunningham. At the suppression hearing before trial, Brown agreed that she was standing about twelve feet away from the car. (R1:135). At trial, however, Officer Joyner estimated that Brown was only approximately four to six feet from the car when she identified Cunningham. (R11:540).

Sciences, later testified at Cunningham's trial that the tests he conducted on Brown's rape kit produced "no evidence that either included or excluded [Cunningham] as being more than a suspect in this case." (R12:639). No seminal fluid was found during Brown's sexual assault examination, which was consistent with her testimony that her attacker wore a condom. (Id.)

Meanwhile, Officer Joyner placed Cunningham under arrest and booked him. (R11:503). Joyner then proceeded to go through Cunningham's belongings. According to Joyner, he found somewhere on Cunningham's person a wallet with an unopened condom inside of it. (Id. at 561–62). Among the contents that Joyner discovered in the backpack confiscated from Cunningham was a pair of black jeans and more unopened condoms. (R1:124–25).

After he finished booking Cunningham, Officer Joyner left the police station to look for more evidence. (R11:563). Along the side of the highway where he had taken Cunningham into custody, Joyner found a knife lying on the ground. (Id. at 566). Because Brown had told him that the rape took place on the side of the concession stand at the park, Joyner also went to that area of the park to investigate. (Id. at 506–07). In that spot, he found an opened condom wrapper (Id. at 508), which was the same brand as the condoms found in Cunningham's wallet and backpack (id. at 508–09; R1:125).

15

## D. The Trial

Cunningham was indicted for rape in the first degree (R1:44–45), and he pleaded not guilty and not guilty by reason of insanity. (R9:16). He eventually admitted that he remembered seeing Brown at the park on the morning of her attack, but he denied or was amnesic regarding Brown's rape. (R2:227). He claimed to have been smoking marijuana and not to have taken his medication for about three months at the time of the rape. (Id.)

Before trial Cunningham's attorney moved to suppress Cunningham's wallet and its contents, the contents of his backpack, and the victim's pre-trial show-up identification. (R1:165; R2:230; R3:463). After a suppression hearing, the state court denied the motion to suppress Brown's identification, which the court determined was not "unduly suggestive or prejudicial." (R3:449). The court did grant Cunningham's motion to suppress the contents of his backpack, including the black jeans and condoms found therein, because Officer Joyner did not search it incident to Cunningham's arrest and later searched it without a warrant as part of an unlawful inventory search. (R1:131; R3:462). Because Joyner testified that he recovered the wallet from somewhere on Cunningham's person rather than from inside the backpack, however, the court determined that it and the condom found inside of it were admissible evidence recovered through a

16

permissible inventory search. (R3:463; R11:461–63).

During the first phase of Cunningham's trial to determine his guilt, the State's evidence included the opened condom wrapper found at the crime scene by Officer Joyner and the unopened condom found in Cunningham's wallet when he was arrested, both of which were the same brand. (R11:508–09). The State also introduced as evidence the knife that Joyner found on the ground where he had initially taken Cunningham into custody. (Id. at 510). However, no fingerprints were found on either the condom wrapper or the knife. (Id. at 401, 404).

Because Brown's identification of Cunningham as her attacker at the police station was also an integral part of the State's case, her description of her attacker to the police and her subsequent identification of Cunningham were both major points of contention at trial. According to Officer Joyner's testimony, Brown initially described her attacker as being tall and skinny, shirtless with black jeans and white sneakers, having blondish-brown hair that was "kind of pouffed out," and holding a pack of cigarettes in his hand. (Id. at 495). On cross-examination, however, Brown admitted that at the suppression hearing she described her attacker as not being tall and only a couple of inches taller than herself (she is only five foot four inches tall). (R12:616). According to the defense, that discrepancy was important because Cunningham is actually six feet tall. (Doc. 56 at 7).

Brown also described her attacker as being about thirty or thirty-five years old, while Cunningham was only twenty-six at the time of the attack. (R12:617 & Doc. 56 at 7). Furthermore, although Brown saw her attacker without a shirt, she admitted on cross-examination that she did not notice any scars on his body. (R12:617). Cunningham has a noticeable scar on his left shoulder. (Doc. 56 at 7). Finally, the only thing that Brown noticed about her attacker's teeth was that they were a yellowish color (R12:619–20), while Cunningham was missing an upper eye tooth and had another broken tooth. (Doc. 56 at 7).

Cunningham's attorney also attempted to undermine Brown's identification by calling Dr. Terence W. Campbell, a forensic psychologist, to testify at trial. Campbell testified that the "emotional turmoil" that Brown was experiencing at the time she identified Cunningham made it unlikely that she was "capable of making an accurate eyewitness identification." (R12:659–60). He also testified that the manner in which Officer Joyner conducted the show-up identification was suggestive. For example, Campbell stated that data "demonstrates that a one-person show up, having a victim look at one individual and one individual only . . . profoundly increases the probability of mistaken identifications compared to other procedures." (Id. at 664). Because Brown only observed Cunningham in the backseat of the police car, moreover, Campbell noted that she was deprived of the

18

opportunity to use height or voice—both "defining characteristic(s)" for identification purposes—in determining whether Cunningham was her attacker. (Id. at 666 & 668).

Despite these attempts to undermine Brown's identification, however, she did identify Cunningham as her rapist at trial. (R11:600). Pointing to where Cunningham was sitting in the courtroom, Brown told the jury that he was the man who had raped her in the park. (Id.)

Cunningham's attorney elicited testimony about information that Officer Joyner received after Cunningham's arrest. Six days after Brown's assault, a woman came to the Flomaton Police Department to volunteer information regarding a transient man in his late thirties she had seen in the area of the park on the morning of Brown's attack. (R11:586–87; R12:647). Joyner admitted on cross-examination that he never investigated that lead. (R:11:587–88).

With this and other evidence having been presented, the case was put to the jury, which found Cunningham guilty of rape in the first degree. (R12:736). The case then proceeded to the second phase of trial concerning Cunningham's affirmative defense of not guilty by reason of severe mental disease or defect.

Dr. Campbell again testified on Cunningham's behalf. Based on a review of Cunningham's extensive mental health history and an interview with him in jail,

19

Dr. Campbell summarized his conclusions at trial:

> First of all, it's clear and evident that Mr. Cunningham suffers from a long standing mental illness of psychotic portions [sic]. The onset of that mental illness dates back, at least, to when Mr. Cunningham was fourteen years of age. Moreover, when Mr. Cunningham experiences a psychotic episode his behavior can become particularly bizarre. Mr. Cunningham's psychological stability is further undermine[d] by his history of a seizure disorder or by his history of epilepsy. When Mr. Cunningham takes appropriate medication as it is prescribed for him he appears able to manage functioning at least at a borderline level of adjusting in the community; without taking appropriate medications however, his behavior can decompensate into psychotic episodes at almost anytime.

(Id. at 781–82).

When asked to shed some light on "what happened in this case to explain [Cunningham's] mental state at the time of the offense," Dr. Campbell noted that Cunningham had reported smoking about five joints of marijuana on the day of the offense. (Id. at 782). According to Campbell, Cunningham's history established that his use of marijuana could have provoked a psychotic episode. (Id. at 782–83). Campbell, therefore, concluded that there was a "high, high likelihood of Mr. Cunningham having reacted to a substance-induced psychotic disorder at the time of the offense." (Id. at 783).

Dr. Campbell found support for his conclusion in the details of the crime. For example, Campbell pointed out that Brown's rapist used a condom, which

20

suggests a premeditated attempt to avoid detection through DNA testing. (Id.) However, the rapist then left the condom wrapper at the crime scene, which did not make any sense to Campbell. (Id. at 783). Campbell also noted that if Cunningham was rationally concerned about avoiding apprehension, he had ample time to try and escape after Officer Joyner initially stopped to question him on the side of the highway. (Id. at 783–84, 786). Instead, Cunningham waited by the road "during the fifteen intervening minutes" as Joyner drove through the park to look for other potential suspects, which indicated that Cunningham was not a rational, logical man. (Id. at 786–87).

Dr. Campbell stated that Brown had done "everything right" as a victim by attempting to humanize herself to the rapist. (Id. at 784). He told the jury that "[w]hat Ms. Brown did, if the rapist in this case was normal and intact and not psychotic, should have worked [be]cause she made herself human." (Id.) However, when a rapist is psychotic, it does not matter how effective the victim's efforts are to enlist the sympathy of her attacker. (Id. at 785).

As for Cunningham claiming that he had no recollection of raping Brown, Dr. Campbell explained that his history of epilepsy could explain the lack of memory. Campbell's report stated that it was an established fact that Cunningham suffered from a seizure disorder. (R2:213). If Cunningham had a seizure shortly

21

after the rape, Campbell testified that it could have wiped out his memory of what had happened just before the seizure. (R12:785; R13:805–06). Campbell also testified that Cunningham's documented history of a seizure disorder combined with his having stopped taking his Dilantin and having smoked marijuana earlier that day "profoundly increases the probability of him having experienced an epileptic seizure shortly after the rape occurred, possibly shortly after he was arrested." (R13:806).

When asked how it was possible for him to distinguish between the effects of Cunningham's marijuana use and the effects of his psychotic disorder, Dr. Campbell answered:

> That we know by virtue of history that this is a man with a long-documented history of psychotic disorders. Therefore, he was not just simply someone whose judgment was impaired merely because he was high on marijuana, no. He is an individual with a long history of mental illness and who has previously experienced psychotic episodes as a result of substance abuse, smoking marijuana; thereby, accounting for his grossly inappropriate behavior . . . , for his generally irrational actions in the form of a substance-induced psychotic disorder which is formally recognized by the definitive reference for diagnosing mental disorders.

(R12:787).

Based on those conclusions, Dr. Campbell testified that it was his opinion that Cunningham was suffering from a "substance-induced psychotic disorder with

22

hallucination" at the time of Brown's assault. (Id. at 788, R13:801). That type of disorder is associated with marked anxiety, depersonalization, and subsequent amnesia. (R13:802). The depersonalization and psychotic state would interfere with the ability to conform one's conduct to the law. (Id.) Although Campbell acknowledged that a cannabis-induced psychotic disorder is extremely rare, he noted that Cunningham's "psychiatric history is also very rare." (Id. at 817). Thus, Campbell concluded that Cunningham "was so suffering from such a mental disease that he was not able to understand the gross inappropriateness of his behavior at the time that he committed those actions." (Id. at 807).

Dr. Robert Defrancisco, a clinical psychologist and board-certified forensic examiner in psychology, testified for the State. (Id. at 824–25). Based on a review of Cunningham's medical records and a three-hour interview with him, Defrancisco concluded that "although [Cunningham] was suffering from a major mental illness he could differentiate right from wrong in this particular instance." (Id. at 830–31). If Cunningham raped Brown, therefore, Defrancisco was of the opinion that he was legally responsible for his conduct. (Id. at 829–30).

Dr. Defrancisco first noted that Cunningham recalled getting off the train in Flomaton and seeing several people as he walked toward town. "He remembered the victim, and he also saw two other people walking that were not near the victim

23

but on the track as well." (Id. at 831–32). In fact, Cunningham had a "vivid recollection of those events as well as [a] vivid recollection of events of the prior three weeks." (R2:226). Then Cunningham claimed to go "blank from that point on, and then he remembers the police picking him up and asking him questions about the incident." (R13:832). Defrancisco found that sort of "selective amnesia" highly unusual and testified that it appeared to be "very self-serving" because there was "no evidence that he had lapses of consciousness where he went into a state of a fugue whereby he didn't remember what he was doing." (Id. at 831, 853, 872). According to Defrancisco, "[o]ne of the most common criminal defenses that I have run across is the individual to say he didn't remember committing the crime." (Id. at 831). Given all the details that Cunningham could remember other than those of the crime itself, Defrancisco concluded that he was faking amnesia. (Id. at 831–32).

Although Dr. Defrancisco acknowledged that Cunningham "may very well have seizure disorders," he did not believe that had been definitively established. (Id. at 869; see also id. at 855, 869–71). There was no indication in his medical records that Cunningham had lapses where he did not know what he was doing, and his history at Camarillo State Hospital suggested psychomotor epilepsy, which might reasonably explain a loss of memory if the period of amnesia was greater

24

than Cunningham claimed. (Id. at 855, 858, 861). Moreover, Defrancisco testified that he did not understand how a person who had a seizure would have remembered to walk hundreds of yards back through the park to pick up a knife that he had left behind during his crime. (Id. at 835–36). (The knife was not found by the concession stand where the rape took place but along the side of the highway where Cunningham was taken into custody. See page 15, above.)

Dr. Defrancisco also disagreed with Dr. Campbell's diagnosis that Cunningham was suffering from a substance-induced psychotic disorder at the time of the offense. (Id. at 875–76). Defrancisco noted that it is "very unusual for cannabis to make a person psychotic." (Id. at 833). Furthermore, Defrancisco testified that to be actively psychotic, one must be having hallucinations and delusions. (Id.) If Cunningham had been in a substance-induced psychotic state, Defrancisco concluded that he would have shown traces of that when Officer Joyner stopped to question him—Cunningham would have been staggering, slurring his speech, dazed, or still actively hallucinating. (Id. at 834). In Defrancisco's words: "You just don't hallucinate for ten minutes or fifteen minutes; usually it's for several hours, several days." (Id.)

According to Dr. Defrancisco, the details of the offense actually suggest that Cunningham was not psychotic at the time Brown was sexually assaulted.

25

Defrancisco testified that a psychotic person does not reason well and "it seems to contraindicate that he would wear a condom or he would drag a person off in the woods." (Id. at 837). If Cunningham were deranged at the time of the attack, Defrancisco reasoned, he would not have been concerned about what was happening around him. (Id.) Defrancisco suggested that Cunningham might have used a condom to avoid leaving semen evidence, but when pressed by defense counsel as to whether such behavior was consistent with Cunningham's failure to flee the scene, Defrancisco retreated from that suggestion and speculated that Cunningham might have used a condom simply in order to avoid disease. (Id. at 852–53). Defrancisco dismissed the notion that Cunningham's failure to flee the park after the rape proved that he was in a psychotic state. (Id. at 839). While one interpretation of that conduct might be that Cunningham was psychotic at that time, another interpretation was simply that Cunningham knew he had committed a heinous crime and thought it best either to deny it or claim amnesia. (Id.) Cunningham could, therefore, have stayed at the crime scene for fifteen minutes because he wanted to make up a lie and use his extensive history of mental illness as a defense. (Id. at 850–51). Defrancisco concluded that he was "inclined to believe that although [Cunningham is] gravely ill and although in fact he has a diagnosis by history of psychosis, that psychosis had nothing to do with this

particular crime." (Id. at 841).

After hearing the expert testimony from both sides, the jury returned a second verdict finding Cunningham guilty of rape, thereby concluding that he had not carried his burden of establishing his affirmative defense of legal insanity. (Id. at 900).

The case then proceeded to sentencing, at which time Cunningham's attorney requested that the state court judge "consider some mitigating factors." (Id. at 910). Among those factors was the fact that Cunningham was suffering from a severe mental illness and "was not on his medication at the time of the offense." (Id. at 911). His attorney asked the court to consider Dr. Campbell's opinion that Cunningham "did not appreciate the wrongfulness of his conduct" in determining an appropriate sentence. (Id. at 911). Because of Cunningham's mental illness, his attorney argued that he needed rehabilitation, and asked the court to consider the possibility of imposing a split sentence. (Id. at 914). Although the state court acknowledged that Cunningham was "a troubled and disturbed man," it determined that he posed a danger both to society and himself. (Id. at 917). As a result, the court sentenced him to life in prison. (Id. at 918).

## II. The State and Federal Postconviction Proceedings

Cunningham appealed his conviction to the Alabama Court of Criminal

Appeals, making five arguments: (1) that the jury improperly disregarded evidence that he was suffering from a severe mental disease or defect at the time of the offense; (2) that the trial court erred by refusing to suppress Brown's show-up identification; (3) that the court erred by failing to suppress his wallet and its contents; (4) that the court erred by not empaneling separate juries to try the two phases of his bifurcated trial; and (5) that the court erred by not permitting his expert to be present in the courtroom during the suppression hearing. (R14; Appellant's Brief in Ala. Ct. Crim. App. at i–ii). The Alabama Court of Criminal Appeals rejected each of Cunningham's arguments and affirmed his conviction. See Cunningham v. State, 727 So. 2d 178 (Ala. Crim. App. 1997). (See R14; Memorandum Opinion of Ala. Ct. Crim. App.). The Alabama Supreme Court denied his petition for a writ of certiorari. See Ex parte Cunningham, 733 So. 2d 493 (Ala. 1998).

On March 26, 1999, Cunningham filed his first petition for habeas corpus in federal court, asserting that the state court erred by denying his motion to suppress Brown's show-up identification. (R16:Tab 1:Petition at 7). He later filed a motion to voluntarily dismiss that petition without prejudice, which the district court granted on August 27, 1999. See Cunningham v. Holt, No. 99-0325-RV-C (S.D. Ala. Aug. 27, 1999). (Id.: Judgment at 1).

28

On December 20, 1999, Cunningham filed a petition in state court under Alabama Rule of Criminal Procedure 32, collaterally attacking his conviction based on ineffective assistance of counsel. (R15:Tab 4:at 1–10). The state court dismissed that petition because "[t]he issues raised by the defendant were raised or could have been raised on appeal pursuant to Rule 32.2 of the Alabama Rules of Criminal Procedure and the petition discloses no newly discovered material or fact which would require that the conviction be vacated." See Cunningham v. State, No. CC-95-439 (Cir. Ct. of Escambia County Feb. 4, 2000). (Id. at Tab 4: Feb. 2000 Circuit Ct. Order). It does not appear that Cunningham appealed the dismissal of that petition.

Cunningham filed a second federal habeas petition on May 24, 2000. (R16: Tab 2: R&R at 14). He claimed both that the use of the show-up identification procedure was so prejudicial that it deprived him of a fair trial and that he was denied effective assistance of counsel. (R16:Tab 2: Petition at 7–8). On January 2, 2001, while that second habeas petition was still pending, Cunningham filed a third one; it challenged the show-up identification of him by Brown. (Id.:Tab 4:Petition at 7).

The district court consolidated the May 2000 and January 2001 petitions. See Cunningham v. Holt, Nos. CA 00-0471-BH-C & CA 01-0004-BH-C (S.D.

29

Ala. Aug. 6, 2001).  (Id.: Rep. & Rec. at 1–2).  The court determined that it was procedurally barred from reaching the merits of the ineffective assistance of counsel claim because Cunningham had raised the same issue in his Rule 32 petition, but he had failed to appeal the state trial court's dismissal of that petition. (Id. at 11 & n.3).  The court also determined that the actual innocence exception to the procedural default doctrine did not apply despite Cunningham's contention that the district court should have ordered "DNA testing on certain identified evidence."[6]  (Id. at 14 n.5).  According to the district court, all Cunningham had done was "make the broad conclusory argument that such testing may exculpate him," and that was insufficient because exculpatory evidence did not exist at the time.  (Id.)  The district court further found that "[s]uch DNA testing . . . is neither warranted nor would it be likely to exculpate [Cunningham] since there was never any direct DNA evidence used in prosecuting him at trial."  (Id.)

The district court also rejected Cunningham's claim relating to Brown's identification because it was adjudicated on the merits in state court and

_____

[6]  We have no way of determining for ourselves precisely what evidence Cunningham wanted tested in connection with his federal habeas petition because the record submitted by the parties is incomplete.  This Court instructed the parties to submit copies of all of the records in the state and federal proceedings relating to Cunningham's conviction.  After searching its records, however, the State was apparently unable to locate and obtain a number of documents from Cunningham's postconviction proceedings.  One of those missing documents is the one the district court cited in reference to the "certain identified evidence" upon which Cunningham wanted DNA testing performed.  (Id. at 14 n.5).

30

Cunningham could not satisfy either of the 28 U.S.C. § 2254(d) exceptions.[7] (Id. at 16–17). Accordingly, both the May 2000 and January 2001 petitions were denied by the district court. (Id.: Aug. 2001 Order at 2). Cunningham's request for a certificate of appealability was later denied both by the district court and by this Court. (Id.: Sept. 2001 Dist. Ct. Order at 2 & 11th Cir. Order).

On October 23, 2003, Cunningham filed a second Rule 32 petition in state court, claiming that he was actually innocent. (R15:Tab 4:2003 Rule 32 Petition). Although Cunningham contended in the petition "that if all the facts of the case had been known to the jury there [was] a strong presumption that the jury would not have convicted [him] of the crime," he never specified what additional facts he was referring to and he never mentioned or requested DNA testing. (Id. at 14). That petition was also dismissed because the issues Cunningham raised were or could have been raised on direct appeal and his petition failed to disclose any newly discovered facts requiring that his conviction be vacated. See Cunningham v. State, No. CC 95-439.60 (Cir. Ct. of Escambia County, Apr. 29, 2004). (Id.: Apr. 2004 Circuit Ct. Order). Cunningham's appeal of that decision was

---

[7] Cunningham filed another habeas petition on January 25, 2001, raising the identical issue of the prejudicial effect of the show-up identification. (See R16:Tab 3: Petition at 7). That petition was dismissed as duplicative by the district court in February 2001. See Cunningham v. Holt, No. 01-0075-CB-M (S.D. Ala. Feb. 21, 2001). (Id.: Order)

dismissed for failure to file a brief.  (Id.: Aug. 2004 Ala. Crim. App. Order).

Cunningham filed his fifth and final federal habeas petition on September 20, 2004, alleging his actual innocence.  (R16:Tab 5: Petition Addendum).  Again, Cunningham summarily contended that "the evidence and facts prove[d] that he [was] not guilty of the crime," but he neither mentioned any biological evidence supporting his position nor requested DNA testing.  (Id.)  The district court construed the petition as being successive and dismissed it for lack of jurisdiction.  See Cunningham v. Ferrell, No. 04-0607-WS-C (S.D. Ala. May 6, 2005).  (Id.: Rep. & Rec.).

### III.  This Lawsuit

In 2004 the Wisconsin Innocence Project, from which Cunningham had previously requested legal assistance, began contacting Alabama authorities including the Flomaton Police Department, the Circuit Court of Escambia County, and the Alabama Department of Forensic Sciences on Cunningham's behalf to determine whether the biological evidence collected in connection with his case had been preserved.  The Wisconsin Innocence Project wanted to conduct STR (short tandem repeat) DNA and mitochondrial DNA testing on the condom wrapper found in the park and on pubic hairs and fingernail scrapings that were recovered from Brown during the sexual assault examination.  Although various

32

authorities have confirmed that the condom wrapper and pubic hairs remain available, the Innocence Project has been unable to determine whether other biological evidence, including the fingernail scrapings, still exists or where it might be located.[8]  Nor has the Innocence Project been able to get access to the biological evidence for DNA testing.  Each of the authorities who has custody of the evidence either refused to release it without a court order or failed to respond to the requests that it do so.

On Cunningham's behalf, the Wisconsin Innocence Project filed this 42 U.S.C. § 1983 lawsuit on June 22, 2006, seeking access to the biological evidence to perform DNA testing.  The defendants named in the suit are the Attorney General of Alabama, the District Attorney of Escambia County, the Chief of the Flomaton Police Department, the Town of Flomaton, and the Clerk of the Escambia County Circuit Court.  According to the complaint, "[t]here was no DNA analysis conducted on either the condom wrapper located at the crime scene

---

[8]  Investigators collected fingernail scrapings from Brown as part of the standard sexual assault examination.  However, the Chief of the Flomaton Police Department was unable to locate the entirety of the rape kit from Brown's examination and reported to the Innocence Project that he believed the kit had been turned over to the District Attorney's Office. Cunningham's complaint alleges "[o]n information and belief, [that] the fingernail scrapings were likely included in [the] sex crimes kit" that was turned over to the District Attorney.  (Doc. 56 at 20).  While the evidence in the record shows that Brown broke loose from the rapist twice and they struggled, it does not indicate that she ever scratched the rapist or provide any particular reason to believe that the fingernail scrapings contain any biological evidence from the rapist.

or the pubic hair and hair fragments collected during Ms. Brown's sexual assault examination." (Doc. 56 at 17). The complaint further alleges that DNA technology at the time of Cunningham's trial "was not as powerful as it is today" and that using current technology:

> DNA profiles can be developed from miniscule quantities of biological material, including the skin and/or saliva cells Ms. Brown's assailant may have left on the condom wrapper in the process of opening the condom during his struggle with Ms. Brown, or skin or other cells transferred from the attacker to Ms. Brown's fingernails. Further, mitochondrial DNA testing is now possible that would allow a comparison of the pubic hair and hair fragments located in Ms. Brown's pubic hair with known samples from both Mr. Cunningham and Ms. Brown.

(Id. at 17–18); but see n.8, supra.

The complaint claims that the defendants' refusal to grant Cunningham access to what he believes to be exculpatory evidence that could lead to a conclusion of innocence violates his: (1) procedural due process right; (2) substantive due process right; (3) Fourteenth Amendment right to make a freestanding claim of actual innocence; (4) right of access to the courts and equal protection of the laws; and (5) right to apply for clemency or a pardon.[9] The relief

_____

[9] Cunningham's complaint also included an additional claim alleging that the defendants' refusal to release the evidence violates his Sixth Amendment rights to confrontation and compulsory process. Because Cunningham has not challenged the district court's dismissal of that claim in his brief to this Court, however, he has waived the issue on appeal. See United States v. Curtis, 380 F.3d 1308, 1310 (11th Cir. 2004).

34

sought is an order requiring the defendants both to deliver the requested evidence to a forensics lab of his choice for testing, which Cunningham has offered to pay for, and to compare any recovered DNA profiles to those in the Combined DNA Index System (CODIS) databank for potential matches.

The defendants moved the district court to dismiss Cunningham's complaint, arguing that he had not established that the denial of postconviction access to evidence for purposes of DNA testing deprives him of a federal constitutional right. The district court agreed. It concluded that Cunningham had failed to state a claim against any defendant upon which relief could be granted and, therefore, dismissed his complaint. As to the defendants who filed answers before moving for dismissal, the court granted judgment on the pleadings.

The court first determined that Cunningham had failed to establish that he has a procedural due process right of postconviction access to the evidence under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). It rejected that claim because "the evidence [he] seeks was available to him prior to trial, there is no allegation that he did not receive a fair trial, and he cannot show at this point that the evidence he seeks would result in a different outcome."

Second, the court dismissed Cunningham's claim that he has a procedural due process right to the evidence under Mathews v. Eldridge, 424 U.S. 319, 96 S.

35

Ct. 893 (1976). The court held that Mathews did not apply because Cunningham did not retain a "continuing liberty interest" after being convicted and sentenced given that "he was not sentenced to death for the rape."

Third, the court determined that Cunningham's reliance on Herrera v. Collins, 506 U.S. 390, 113 S. Ct. 853 (1993), to establish his right to raise a freestanding actual innocence claim was misplaced. The court reasoned that "the potential for a free-standing constitutional claim of actual innocence appears to be only available in a capital case."

Fourth, the district court concluded that Cunningham had failed to state a valid claim based on his right of access to the courts because he could not satisfy the actual injury requirement.

Finally, the court dismissed Cunningham's claim based on his right to apply for clemency or a pardon. The court concluded that "because there is no substantive due process right of access to evidence to present claims in executive clemency proceedings or otherwise, such a right cannot be the basis for an action under § 1983." (Doc. 58 at 25 (citation and quotation marks omitted)).

In this appeal Cunningham contends that the district court erred by holding that he does not have a constitutional right of postconviction access to the biological evidence for purposes of DNA testing. We withheld our decision in

36

this appeal to await the Supreme Court's decision in an Alaska case involving a similar § 1983 claim for DNA testing. In District Attorney's Office for the Third Judicial District v. Osborne, ___ U.S. ___, 129 S. Ct. 2308 (2009), the Supreme Court recognized a limited liberty interest in postconviction access to DNA evidence, but it held that Alaska's state-law procedures were adequate to satisfy due process. After the Court issued its decision, we asked the parties for supplemental briefing to address Osborne's impact on this appeal. In response, Cunningham conceded that his Brady, substantive due process, Herrera-based actual innocence, and clemency-related claims did not survive the Osborne decision. We agree with those concessions. See Osborne, 129 S. Ct. at 2319–23.

What is left after Osborne, according to Cunningham, are two claims: his procedural due process challenge to the adequacy of Alabama's state-law procedures for postconviction relief, under the fundamental fairness standard discussed in that decision; and his access to courts claim, which largely overlaps with the due process claim. The State agrees with Cunningham that Osborne provides the rule of decision for this case.

## IV.  General Legal Standard

We review de novo judgment on the pleadings and on motions to dismiss.

Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Cannon v. City of W. Palm

Beach, 250 F.3d 1299, 1301 (11th Cir. 2001). "Judgment on the pleadings is

proper when no issues of material fact exist, and the moving party is entitled to

judgment as a matter of law based on the substance of the pleadings and any

judicially noticed facts." Andrx Pharm., Inc. v. Elan Corp., 421 F.3d 1227,

1232–33 (11th Cir. 2005). We accept all the facts in the complaint as true and

view them in the light most favorable to the nonmoving party. Cannon, 250 F.3d

at 1301. At the same time, however, we also take judicial notice of the state and

federal court proceedings in which Cunningham was convicted or attacked his

conviction.[10] See Moore v. Estelle, 526 F.2d 690, 694 (5th Cir. 1976)[11] ("[W]e

take judicial notice of prior habeas proceedings brought by this appellant in

connection with the same conviction. This includes state petitions, even when the

prior state case is not made a part of the record on appeal. . . ." (citations omitted)).

Section 1983 creates a cause of action for anyone subjected "to the

---

[10] The defendants originally submitted two volumes of record excerpts from Cunningham's state court trial. Those record excerpts were stricken by order of an administrative panel of this Court. That order is not binding on us as a merits panel. See 11th Cir. R. 27-1(g). We had the parties submit to us a complete record of each of the related state and federal proceedings, to the extent that those records still exist, and we have considered everything they have submitted.

[11] See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in the Eleventh Circuit all decisions of the former Fifth Circuit announced prior to October 1, 1981).

deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. This Court has held that claims seeking postconviction access to evidence for DNA testing may be brought in a § 1983 action. Bradley v. Pryor, 305 F.3d 1287, 1290 (11th Cir. 2002); cf. Osborne, 129 S. Ct. at 2318–19 (assuming, without deciding, that § 1983 is a proper vehicle for such claims).

## V. Discussion

### A. The Limitations of DNA Evidence in this Case

Cunningham's case differs in its facts from two recent cases in which we affirmed dismissal of similar § 1983 actions seeking postconviction DNA testing.[12] In Bradley v. King, 556 F.3d 1225 (11th Cir. 2009), dismissal was appropriate because testing had already been performed on some of the physical evidence, and the state had been unable to locate the additional items Bradley sought to test. Id. at 1231. In Grayson v. King, 460 F.3d 1328 (11th Cir. 2006),

---

[12] Both of those cases were decided before Osborne, and we considered both litigants' procedural due process claims within the framework of Brady v. Maryland and Mathews v. Eldridge. Bradley v. King, 556 F.3d 1225, 1230 (11th Cir. 2009); Grayson v. King, 460 F.3d 1328, 1336–42 (11th Cir. 2006). That is no longer the correct legal standard for evaluating a postconviction DNA-access claim. See Osborne, 129 S. Ct. at 2320 (instead applying a "fundamental fairness" standard based on Medina v. California, 505 U.S. 437, 112 S. Ct. 2572 (1992)).

the claimant had been convicted of capital murder and sentenced to death after he and a co-defendant raped and killed an elderly woman during the course of a burglary. Id. at 1330–34. There was no possibility that the DNA testing he sought could have proved that Grayson, who had admitted his involvement in the burglary, was innocent of the capital murder. Id. at 1339. Even if DNA test results did exclude Grayson as the source of the blood and semen evidence, that would have indicated only that an accomplice had committed the actual rape. Id.

In this case, by contrast, we cannot say that there is absolutely no possibility that DNA testing of the biological evidence could help Cunningham establish that he was innocent of the rape charge. Although we seriously doubt, for reasons we will explain more fully later, that the testing of any one of the individual items to which Cunningham seeks access could raise questions about his guilt, it is theoretically possible that testing all of them might do so. For example, if the same DNA profile were found on the condom wrapper from the crime scene and on either the pubic hairs from Brown's pubic combings or in the fingernail scrapings (if any exist), and that DNA profile did not match his own, that would be evidence that Cunningham is not the rapist.

Other combinations of test results are unlikely to prove innocence. If, for example, DNA were recovered from the pubic hairs that did not match

Cunningham or Brown, that would not prove his innocence. The same is true of the fingernail scrapings, if they still exist. A non-match from the hair samples might simply indicate that Brown had consensual sex with someone else near the time of her attack. A non-match from the fingernail scrapings might simply indicate that she had contact, sexual or otherwise, with someone else. The state trial record does not establish whether Brown was sexually active in August 1995. Neither side asked her whether she had sex with another person in the hours leading up to the rape. Without evidence on that point, we cannot say that DNA tests on either the pubic hairs or fingernail scrapings would by themselves establish that Cunningham is innocent.

Nor could exculpatory test results from the opened condom wrapper alone ever indicate that Cunningham is innocent. Even if DNA from someone other than Cunningham was on the wrapper, nothing in the record establishes that everyone who handled the condom wrapper took precautions to ensure that their DNA was not left on it by accident. We know for a fact that they did not. The record shows that two witnesses at Cunningham's trial, Officer Joyner and Chief of Police Wilkerson, while they were on the stand complied with requests to take the condom wrapper out of its evidentiary package so that they could identify it. Any DNA found on the condom wrapper could be from any of a number of people

41

who handled it after Cunningham's arrest, including some who are unknown. <u>See</u> <u>Osborne</u>, 129 S. Ct. at 2327–28 (Alito, J., concurring) (noting the difficulty, even with the most advanced STR technology, of extracting meaningful results from "messy" crime scene samples that have been exposed to the elements and handled by investigators).

Moreover, Officer Joyner found the condom wrapper on the ground at the city park. Although the fact that it was the same brand as the condoms in Cunningham's backpack and wallet and was found near the concession stand where Brown said the rape occurred is circumstantial evidence of his guilt, there is no way of knowing for sure that it is the wrapper left by Brown's rapist instead of litter left by someone else. The point of this discussion is that the possibility that DNA testing could help establish that Cunningham is innocent is not great, and that point is reinforced by the amount of the evidence indicating that Cunningham is in fact guilty.

Brown identified Cunningham as her rapist. Although he attempted to undermine the credibility of that identification, testimony established that Brown identified him only about fifteen minutes after the last time she had seen her rapist. Not only that, but Brown also had ample opportunity to view her attacker in broad daylight, when he confronted her with the knife, when she stalled by getting him

to sit down and talk to her, when he pulled her toward the woods, when she convinced him to walk with her toward a less secluded area, when he tackled her after she broke loose and ran, when he held her down, when he put on a condom and raped her, and when she tried to avoid further harm by talking to him afterwards. In these circumstances, Brown's eyewitness identification of Cunningham is powerful evidence of his guilt. See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977) (setting forth factors, including the witness's opportunity to view the suspect and the time that elapsed between the crime and the identification, for consideration in determining whether a suggestive identification was nevertheless reliable) (citing Neil v. Biggers, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972)); see also United States v. Burke, 738 F.2d 1225, 1229 (11th Cir. 1984) (holding that a suggestive identification was nonetheless reliable where the witness was in the defendant's "presence long enough for her to closely observe him," "paid attention to [him] because he was one of the few customers in the restaurant," and only "two months elapsed between the first meeting and the confrontation"); O'Brien v. Wainwright, 738 F.2d 1139, 1141–42 (11th Cir. 1984) (holding that an impermissibly suggestive photo lineup did not taint a later identification where, "[a]lthough [the victim] only observed the burglar for a matter of seconds, [he] had a closeup view . . . of the

43

burglar's face in a well-lighted room" and the time that had elapsed between the crime and the photo lineup was less than one day). And, Brown identified Cunningham as her rapist a second time at trial.

There was also strong circumstantial evidence of Cunningham's guilt. Given Brown's testimony that her rapist held her at knifepoint, it is significant that Officer Joyner found a knife lying on the ground in the exact spot on the highway where he had initially stopped Cunningham.

Even though the contents of Cunningham's backpack were suppressed before trial, we should consider that evidence in evaluating Cunningham's underlying premise that he is innocent. Cf. Johnson v. Singletary, 938 F.2d 1166, 1184 (11th Cir. 1991) (en banc) (noting that "the Supreme Court has admonished courts to apply the test for 'actual innocence' in light of all probative evidence, including evidence that was admitted (or excluded) as a result of constitutional error" (emphasis omitted) (citing Kuhlmann v. Wilson, 477 U.S. 436, 454 n.17, 106 S. Ct. 2616, 2627 n.17 (1986))). The backpack contained a pair of black jeans, which is important given that Brown described her rapist as wearing black pants. Although there was some inconsistency in the testimony concerning Brown's description of the pants, the evidence nonetheless indicates Cunningham's guilt and undermines his argument that the fact he was wearing

44

blue sweat pants when he was arrested shows he was not the rapist. At the suppression hearing, Brown simply stated that she thought the "black pants" her attacker was wearing "were corduroy." Officer Joyner's testimony at trial described Brown as having told him that her attacker was wearing "black jeans." We are not convinced that this inconsistency undermines the strength of the State's case against Cunningham.

Finally, the extensive evidence concerning Cunningham's mental health history suggests that he was Brown's attacker. That evidence included the fact that Cunningham was mentally disturbed about matters of sex. He was so disturbed that one psychologist, who had been practicing for over twenty-five years, testified that some of the bizarre behavior Cunningham had engaged in was so rare that he could remember having observed only three or four episodes like it, and those were by "exceedingly disturbed, very psychotic inmates" most of whom were in a penitentiary. (R12: 743, 754). While in a mental institution Cunningham had also physically attacked and fondled the breasts of a female intern, claiming later that he thought she was a mannequin that had stolen his mother's clothes. Cunningham said that he had taken drugs on the day that he attacked that intern, just as he later said that he had smoked marijuana on the day Brown was attacked. And that is not the only similarity between Cunningham's

45

earlier sexual assault and Brown's rape. When he attacked the intern, Cunningham told the young woman that he had a knife and would kill her if she did not submit to him. Similarly, the rapist threatened Brown with a knife.

The evidence also shows that Cunningham admitted to another psychologist that he recalled getting off the train near the park on the morning of the rape and remembered seeing Brown there. The psychologist testified that Cunningham "was able to supply me a lot of details to this incident and then he became amnesic for the kidnap and rape." (R13: 831). The psychologist did not believe the convenient claim of amnesia, finding it "highly unusual that someone could have selective amnesia like that," and concluded that Cunningham was faking amnesia at that point. (Id. at 831–32). Cunningham's admission to being near the crime scene at the time of the rape, his admission to seeing the victim there before she was raped, and his self-serving, selective amnesia about the actual rape is strong evidence of guilt.

Even so, there remains the slim possibility that DNA testing might reveal evidence suggesting that Cunningham is innocent. In this respect the facts of this case resemble those in Osborne, where there was a chance, however improbable in the light of other evidence, that the requested testing might point to someone else as the perpetrator.

## B. The <u>Osborne</u> Decision

Osborne was convicted in Alaska state court of kidnapping, assault, and sexual assault. <u>Osborne</u>, 129 S. Ct. at 2314. He and an accomplice were charged with picking up a prostitute and then, after she demanded payment in advance, raping and severely beating her, and leaving her for dead in the snow. <u>Id.</u> at 2313. The victim's identification of Osborne was not as strong as Brown's identification of Cunningham in this case. The crime in <u>Osborne</u> happened in the evening; the victim had suffered a head injury; the first time she picked out Osborne's photo was several days after the fact, and she did so "with some uncertainty." <u>Id.</u> at 2312–13. There was, however, other evidence of Osborne's guilt. <u>Id.</u> His accomplice gave a statement to police implicating both Osborne and himself, and other witnesses placed Osborne with the accomplice shortly before the crime. <u>Id.</u> A blue condom apparently used by the rapist was found at the crime scene, along with some pubic hairs. <u>Id.</u> The State tested semen from the condom using relatively imprecise DQ Alpha testing, which excluded the victim, Osborne's co-defendant, and a third suspect, and matched Osborne but also matched about 16% of the black male population. <u>Id.</u> The pubic hairs appeared similar to Osborne's, but they were not suitable for DQ Alpha testing. <u>Id.</u> at 2313–14. A more precise RFLP-DNA test was available at the time, but Osborne's attorney, who presented

a mistaken-identity defense at trial, made a tactical decision not to use that test because she feared its result would inculpate him further. Id. at 2314.

After his convictions were affirmed on direct appeal, Osborne sought collateral review under Alaska Stat. § 12.72, Alaska's general postconviction relief statute. He claimed that further DNA testing of the semen and hairs, which he now requested under discovery rules, would prove his innocence. Osborne, 129 S. Ct. 2308, Joint Appendix at 22. The Alaska Court of Appeals held that Osborne could not obtain discovery under the state statute because the testing he sought had been available at trial, so he failed to meet the statute's requirement that the evidence be both "new" and diligently obtained. Osborne v. State, 110 P.3d 986, 995 (Alaska Ct. App. 2005). However, the court also held that the due process clause of Alaska's constitution might allow a petitioner claiming actual innocence to obtain postconviction DNA testing even if he did not meet the requirements of the statute. Id. For that reason, the court remanded, directing the trial court to consider three factors in deciding whether Osborne had a state constitutional right to DNA testing: (1) whether the conviction rested primarily on eyewitness identification; (2) whether there was "demonstrable doubt" as to the identification of the perpetrator; and (3) whether scientific testing would likely be conclusive. Id.

48

On remand, the trial court reconsidered the evidence and found that Osborne had failed to meet any of the three elements. Osborne v. State, 163 P.3d 973, 975 (Alaska Ct. App. 2007). Because other physical evidence linked Osborne to the scene and witnesses placed him with the other perpetrator, the conviction did not rest "primarily" on the victim's identification and there was no "serious doubt" about that identification. Id. at 978. The court also found that even if testing revealed someone else's DNA it would not be conclusive proof of innocence, given the "extensive" other evidence against Osborne and the possibility that because the condom had been discovered more than a day after the assault, it might have been left coincidentally by someone unconnected to the crime. Id. The Alaska Court of Appeals agreed with the trial court's conclusions, and affirmed the denial of Osborne's petition. Id. at 982.

Meanwhile, Osborne had filed a § 1983 action in federal district court. Asserting a variety of constitutional claims, he asked the court to compel the Anchorage District Attorney's Office to allow him access to the semen from the condom and the hairs, for mitochondrial and STR-DNA testing at his own expense. The district court granted summary judgment for Osborne, holding that under the unique facts of the case, he had a "very limited constitutional right" to DNA testing. Osborne v. District Attorney's Office for Third Judicial Dist., 445

F. Supp. 2d 1079, 1081 (D. Alaska 2006). The court noted that the testing

Osborne sought had not been available at trial, that it could be done at no cost to

the State, and that the result could be "significant" to determining guilt or

innocence in proceedings for postconviction relief. Id. The Ninth Circuit

affirmed. Osborne v. District Attorney's Office for Third Judicial Dist., 521 F.3d

1118 (9th Cir. 2008). Reasoning that the prosecutorial duty under Brady v.

Maryland to disclose exculpatory evidence extended to the postconviction context,

the Ninth Circuit held that due process prohibited the State from denying Osborne

access to biological evidence for DNA testing. Id. at 1128, 1141–42. The

Supreme Court granted certiorari and reversed. 129 S. Ct. at 2316.

The Supreme Court held that Osborne's due process rights had not been

violated. It rejected Osborne's substantive due process argument, refusing to

recognize a "freestanding right to DNA evidence" unconnected to any underlying

liberty interest. Id. at 2323. Osborne also asserted a procedural due process claim,

arguing that the DNA testing was a "process" he needed to vindicate his liberty

interest in proving his innocence and obtaining various forms of postconviction

relief. Id. at 2319. The Court rejected Osborne's attempt to assert a federal liberty

interest in bringing an "actual innocence" claim under Herrera v. Collins, 506 U.S.

390, 113 S. Ct. 853 (1993). Assuming without deciding that such a Herrera claim

exists, the Court noted that the claim should be brought in habeas, where federal rules allowing discovery for good cause would satisfy the requirements of due process.  Id. at 2321–22.  It also held that Osborne did not have a liberty interest in seeking pardon or commutation, because no one is entitled to executive clemency as a matter of Alaska law.  Id. at 2319.  However, the Court said, where state law entitles a petitioner to have his conviction vacated upon a sufficiently strong showing of actual innocence, a liberty interest is created and the State's procedures for vindicating that interest must satisfy due process.  Id.

Because a criminal defendant convicted after a fair trial no longer enjoys the presumption of innocence, his liberty interest is more limited and the State has more flexibility in deciding what procedures are necessary.  Id. at 2320.  Postconviction relief proceedings do not require the full range of procedural rights that are available at trial, and Brady v. Maryland has no application in the postconviction context.  Id. at 2319–20.  The Supreme Court held that a State's process for postconviction relief is constitutionally adequate unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation."  Id. at 2320 (quoting Medina v. California, 505 U.S. 437, 446, 448, 112 S. Ct. 2572, 2577–78 (1992)).  Federal courts may not

interfere unless the State's process is "fundamentally inadequate to vindicate the substantive rights provided." Id.[13]

The Supreme Court attempted neither to define exactly the level of process required to satisfy the fundamental fairness standard nor to specify the process due. See id. ("When a State chooses to offer help to those seeking relief from convictions, due process does not dictate the exact form such assistance must assume." (citation, brackets, and quotation marks omitted)). Instead, the Court concluded that there was "nothing inadequate" about Alaska's postconviction relief procedures, either in general or specifically with regard to requests for access to DNA evidence. Id. In reaching that conclusion, the Court pointed to several factors: Alaska's statute "provides a substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence"; "[i]t exempts such claims from otherwise applicable time limits"; and it "provides for discovery in postconviction proceedings." Id. The Court noted at least one state trial court had applied the statute to grant a request for DNA testing. Id. (citing Patterson v. State, No. A-8814, 2006 WL 573797, at *4 (Alaska Ct. App., Mar. 8,

_____

[13] As Cunningham concedes, the correct standard for evaluating the State's denial of a request for postconviction DNA testing, therefore, is Medina's "fundamental fairness" inquiry and not the Mathews v. Eldridge balancing test. See id. at 2332 n.3 (Stevens, J., dissenting).

52

2006)).[14]

The Supreme Court decided that Alaska's limitations on postconviction relief claims—that the evidence be "newly available," that it have been diligently pursued, and that it be "sufficiently material"—are "not inconsistent with the traditions and conscience of our people or with any recognized principle of fundamental fairness." Id. at 2320–21 (citation and quotation marks omitted). In doing so, the Court considered the fact that those limitations were similar to the ones imposed by other States' DNA evidence procedures and by federal law, thereby suggesting that the "fundamental fairness" of a State's procedure for postconviction relief can be measured by comparison to other jurisdictions. See id. at 2320. Statutes providing for postconviction DNA testing typically place a variety of constraints on access to DNA evidence, such as requiring a showing of

---

[14] Patterson had been convicted in 1982 of sexual assault, assault, and kidnapping. In 2003 he filed a new petition for postconviction relief and requested DNA testing. Patterson, 2006 WL 573797 at *1. The state trial court initially granted his request, but it turned out that the biological evidence from the rape had long since been destroyed. Id. Patterson then argued that the destruction of that evidence was "new evidence" entitling him to relief. Id. In affirming the trial court's denial of his petition, the Alaska Court of Appeals held that Patterson's request failed on grounds of diligence and timeliness. Id. at *4. Because the DNA testing he sought had been available as early as 1997, when he had filed an earlier postconviction petition asserting other grounds for relief, the evidence—or at least the fact of its destruction—could have been discovered much earlier. Id. It seemed unlikely that DNA would have exonerated him, given that he was identified by two victims who had spent several hours with him. See Patterson v. State, 689 P.2d 146, 147 (Alaska Ct. App. 1984). Even though Patterson never obtained the testing he sought, the case nevertheless demonstrates Alaska courts' recognition that claims for DNA testing could be brought under the State's general postconviction relief statute.

materiality or a sworn statement that the applicant is innocent.  Id. at 2317.  Some

States require that the requested testing have been technologically unavailable at

the time of trial; others deny testing to applicants who had declined it at trial for

tactical reasons.  Id. (citing examples).  Osborne clearly implies, if it does not

actually hold, that such limitations are permissible.

The Supreme Court acknowledged "some uncertainty in the details" of how

claims for access to DNA might fare under Alaska's postconviction relief

procedures.  Id. at 2321.  However, it reasoned that the State could not be blamed

for this uncertainty, because Osborne "ha[d] not tried to use the process provided

to him by the State or attempted to vindicate the liberty interest that is now the

centerpiece of his claim."  Id.  The Court noted that Osborne had not sought from

the state courts the same STR-DNA testing he was seeking in his federal lawsuit,

and that Osborne's "attempt to sidestep state process" put him in a "very awkward

position," making it "difficult" for him to criticize the state process.  Id.  If

Osborne were to make such a request in state court now, "he might well get

it"—or if not, "it may be for a perfectly adequate reason, just as the federal statute

and all state statutes impose conditions and limits on access to DNA evidence."

Id.  Although it did not impose a general requirement for exhaustion of state-law

remedies, the Court nevertheless held that it was Osborne's burden to demonstrate

54

the inadequacy of state-law procedures for postconviction relief.  Id.  Because

Alaska's procedures were adequate on their face, and Osborne had not tried them,

he could not complain that they might not work in practice.  Id.

### C.  The Procedural Due Process Claim

To succeed on his due process claim, Cunningham must show that

Alabama's procedure for considering a postconviction request for DNA testing is

so inadequate that it fails to satisfy Osborne's standard of fundamental fairness.  In

this case, as in Osborne, there is no statute or court rule specifically providing for

postconviction DNA testing in non-capital cases.  The lack of a DNA-specific

statute or rule is not, in itself, a procedural due process or other constitutional

problem.  If it were, the Osborne decision would have come out differently.  See

id. at 2320 ("We see nothing inadequate about the procedures Alaska has provided

to vindicate its state right to postconviction relief in general, and nothing

inadequate about how those procedures apply to those who seek access to DNA

evidence.").

The Supreme Court did have something to say in Osborne about Alabama's

procedures.   After describing Alaska as "one of a handful of States yet to enact

legislation specifically addressing the issue of evidence requested for DNA

testing," the Court stated that did not mean that access to such evidence is

55

unavailable. <u>Id.</u> at 2317. Instead, it noted with approval that "Alaska courts are addressing how to apply existing laws for discovery and postconviction relief to this novel technology." <u>Id.</u> The Court then pointed to Alabama as another example where "[t]he same is true." <u>Id.</u> It cited <u>Fagan v. State</u>, 957 So. 2d 1159 (Ala. Crim. App. 2007), in which the Alabama Court of Criminal Appeals had recognized that "the need for postconviction DNA testing may be presented in a Rule 32 petition." <u>Fagan</u>, 957 So. 2d at 1159; <u>see also</u> <u>Osborne</u>, 129 S. Ct. at 2326 n.2 (Alito, J., concurring) (similarly citing <u>Fagan</u> to show that Alabama has "addressed the issue through judicial decisions"). By citing the <u>Fagan</u> decision in that manner, the Court signaled approval of Alabama courts' efforts to apply existing general procedures to the problem.

With that signal in mind, we must decide for Alabama, as the Supreme Court did for Alaska, whether the State's general procedures for postconviction relief are constitutionally adequate to secure any limited liberty interest Cunningham may have in seeking DNA evidence that might prove his innocence. The Supreme Court did not define a level of process necessary to satisfy the fundamental fairness standard, but it did find Alaska's procedures to be constitutionally adequate. <u>Id.</u> at 2320. Alabama's procedures pass muster if they compare favorably with Alaska's. <u>Osborne</u> itself invites such a comparative

56

approach, describing key elements of Alaska's process as both "similar" to other state and federal statutes and also "not inconsistent" with fundamental fairness. Id. at 2320–21.

## 1. What Alabama Provides in Non-capital Cases

As Cunningham points out, no Alabama court has recognized anything comparable to the state-constitutional "safety valve" that the Alaska Court of Appeals suggested might be available to claimants asserting actual innocence who fail to meet the requirements of that state's postconviction relief statute. See Osborne v. State, 110 P.3d 986, 995 (Alaska Ct. App. 2005) (procedural defaults might be excused if petitioner asserting innocence could show (1) conviction rested primarily on eyewitness identification evidence; (2) there was demonstrable doubt as to defendant's identification; and (3) scientific testing would likely be conclusive). It is more accurate to say that no Alabama court has been asked to decide if as a matter of Alabama constitutional law such a failsafe procedure exists there, as it does in Alaska.

In any event, the Supreme Court did note this alternative procedural route to obtaining evidence in Alaska while reaching its conclusion that State's process was constitutionally adequate. Osborne, 129 S. Ct. at 2321. The Court did not suggest, however, that it was essential. In one paragraph the Court considered

Alaska's statute, found "nothing inadequate" about it, and called it "not inconsistent" with fundamental fairness. It then started a new paragraph stating "And there is more," in which it discussed the safety valve. Id. at 2320–21. The implication is that the state-constitutional safety valve provision is helpful ("is more"), but it is not necessary to the Court's conclusion that Alaska's procedures satisfy due process.

On their face, Alabama's general statutory provisions for postconviction relief are substantially similar to Alaska's. See generally Ala. R. Crim. P. 32; Alaska Stat. § 12.72. Alabama's Rule 32.1(e) allows a criminal defendant to institute a proceeding on the ground that "[n]ewly discovered material facts exist" which require vacation of his conviction, "because . . . (5) [t]he facts establish that the petitioner is innocent. . . ." That is not significantly different from the situation in Alaska, where a defendant may seek postconviction relief if he claims "that there exists evidence of material facts, not previously presented . . . that requires vacation of the conviction. . . ." Alaska Stat. § 12.72.010(4).

Both States waive otherwise applicable time limits when a claim is based on new evidence that could not have been discovered earlier with reasonable diligence. Alabama requires that a petition be filed within six months of the discovery of the new evidence. Ala. R. Crim. P. 32.2(c); see id. 32.1(e)(1) (stating

58

"reasonable diligence" requirement).  Alaska imposes no specific time limit on new evidence filings but does require that the claim be presented with "due diligence."  Alaska Stat. § 12.72.020(b)(2).  Both States impose limits on what kinds of "new facts" may be presented as a basis for postconviction relief.  The new evidence must not be merely cumulative to what was presented at trial; it must not be merely impeachment evidence; and it must establish innocence.  Ala. R. Crim. P. 32.1(e)(2)–(5); Alaska Stat. § 12.72.020(b)(2)(B)–(D).

In one respect, Alabama's process is more petitioner-friendly than Alaska's is.  Alabama requires only that innocence be shown by a preponderance of the evidence to obtain a new trial, while Alaska requires that it be shown by clear and convincing evidence.  Compare Ala. R. Crim. P. 32.3, with Alaska Stat. § 12.72.020(b)(2)(D).  But, then, Alabama applies the more limited criminal discovery rules and requires a threshold showing of "good cause," while Alaska makes full civil discovery available.  Compare Ala. R. Crim. P. 32.4 and Ex parte Land, 775 So. 2d 847, 852 (Ala. 2000), with Alaska R. Crim. P. 35.1(g).  The state court proceedings in Osborne itself suggest, though, that in practice Alaska's courts are not any more generous in granting postconviction discovery than Alabama's are.

Requests for postconviction discovery under Rule 32 are evaluated under

the standard articulated by the Alabama Supreme Court in Land, where it held that a petitioner must make a threshold showing of "good cause" before a trial court can exercise its inherent authority to order discovery in postconviction proceedings. 775 So. 2d at 852. The state high court cautioned that "postconviction discovery does not provide a petitioner with a right to 'fish' through official files," and that "it is not a device for investigating possible claims, but a means of vindicating actual claims." Id. (citations and quotation marks omitted).

In the nine years since Land, Alabama's Court of Criminal Appeals has issued approximately four dozen decisions addressing Rule 32 discovery requests. Those decisions indicate that discovery requests fail if they are too broad or unusually burdensome to the State, if they do not relate to a viable underlying claim, or if they are not clear and specific as to what they anticipate the requested evidence will show. For example, in Jackson v. State, the trial court had granted a death row inmate sweeping and unlimited discovery that encompassed not only the prosecution's entire case file but also records from more than twenty different state and local law enforcement and correctional agencies. 910 So. 2d 797, 800–01 (Ala. Crim. App. 2005). Overruling the State's objections, the circuit judge had remarked: "[W]e're talking about . . . someone's life . . . the stakes are

as high as they can get. What is wrong with letting them have the discovery? If they are on a fishing expedition, then they're not going to be able to prove it anyway." Id. at 801 (emphasis omitted). On a petition for mandamus, the Court of Criminal Appeals agreed with the State that most of Jackson's discovery requests should have been denied because they were unrelated to his Rule 32 claims or even to the case at all, and they appeared to be "merely an attempt to conduct a fishing expedition." Id. at 810. Quoting extensively from Land, the court criticized the trial judge for failing to apply the "good cause" standard. Id. at 801–03.

Alabama's threshold good cause requirement limiting postconviction discovery does not make it an outlier among states, and that limitation does not run afoul of Osborne's fundamental fairness standard. The Alabama Supreme Court expressly borrowed the "good cause" standard from high-court decisions in three other states. Land, 775 So. 2d at 852 (citing cases from Illinois, Florida, and New Jersey). Federal habeas rules similarly require a "good cause" threshold showing for discovery requests in habeas proceedings, 28 U.S.C. § 2254 Rule 6, Rules Governing § 2254 Cases, and the Supreme Court has stated that it sees "no due process problem" with the federal habeas standard. Osborne, 129 S. Ct. at 2321–22.

Although the Alabama Supreme Court has not yet considered a request for postconviction DNA testing, three decisions from the Alabama Court of Criminal Appeals have. In Dowdell v. State, 854 So. 2d 1195 (Ala. Crim. App. 2002), an inmate convicted of rape filed a Rule 32 petition requesting DNA testing in order to prove his innocence. The court held that his claim was barred as untimely under Rule 32.2(c), because the testing he sought had been available for more than ten years before he filed his petition, and his assertion that he had only recently learned about DNA was not credible. Id. at 1197–98. In Barbour v. State, 903 So. 2d 858 (Ala. Crim. App. 2004), a timely Rule 32 request for DNA testing was denied on materiality grounds. Because Barbour had only been convicted as an accomplice to rape, the court held, a DNA result that pointed to someone else as the actual rapist would not be relevant. Id. at 867. In Fagan v. State, 957 So. 2d 1159 (Ala. Crim. App. 2007), the petitioner bypassed Rule 32 altogether and filed a "motion for postconviction DNA testing." Because Alabama law did not recognize any such freestanding motion, the Court of Criminal Appeals held that the trial court's denial of the motion was nonappealable, and dismissed the appeal. Id. Cunningham quotes extensively from concurrences and dissents in these three cases that complain of the lack of specific procedures for postconviction DNA testing in Alabama and that urge the legislature to address the issue. See Fagan,

62

957 So. 2d at 1159 (Baschab, J., dissenting); <u>Barbour</u>, 903 So. 2d at 872–73

(Baschab, J., dissenting); <u>Dowdell</u>, 854 So. 2d at 1198–1203 (Shaw, J., concurring

in result); <u>id.</u> at 1203–05 (Baschab, J., dissenting).  However, the majority's

language in two of those cases recognizes that a properly presented Rule 32

petition can be used to seek DNA testing.  <u>See</u> <u>Fagan</u>, 957 So. 2d at 1159 ("[W]e

have recognized that the need for postconviction DNA testing may be presented in

a Rule 32 petition."); <u>Dowdell</u>, 854 So. 2d at 1198 ("Had Dowdell filed his

petition within a reasonable time . . . we would have considered the merits of his

petition.").  Nothing in the third case contradicts that.  <u>See generally</u> <u>Barbour</u>, 903

So. 2d 858.

Several additional orders and decisions make clear that Rule 32 discovery

can be used to obtain physical evidence for forensic testing.  In April 2009, death

row inmate Thomas Arthur filed a Rule 32 petition and persuaded the Jefferson

County Circuit Court to order DNA testing that might corroborate another

inmate's eleventh-hour confession to the crime.[15]  In <u>Stallworth v. State</u>, CC-98-

_____

[15] The underlying facts and earlier procedural history of the case are summarized in <u>Arthur v. Allen</u>, 452 F.3d 1234, 1238–43 (11th Cir. 2006), <u>modified on reh'g</u>, 459 F.3d 1310 (11th Cir. 2006).  Arthur's identification as the perpetrator had not been in much doubt at his trial, given that the victim's wife had confessed to hiring Arthur to kill her husband.  Even so, the state trial court ordered the Alabama Department of Forensic Sciences to conduct DNA testing on items recovered from the crime scene to determine whether Gilbert, the author of the purported confession, had been present.  When test results came back showing no match to Gilbert, the court found that Arthur had colluded with him to "perpetrate a fraud" on the court,

63

112.60 (Baldwin County Cir. Ct., Aug. 12, 2008), an inmate used Rule 32 to get new testing of a bloodstain that had been found on his jacket, in order to support his claim that the blood had been planted by police. See State v. Stallworth, 868 So. 2d 1128, 1136–38 (Ala. Crim. App. 2001) (summarizing background). In Hinton v. State, CR-04-0940, 2006 WL 1125605, (Ala. Crim. App., Apr. 28, 2006), an inmate used Rule 32 to obtain discovery of ballistics evidence and to have it retested by his own experts in order to challenge the state's trial evidence that the same gun had been used in three different crimes. In Ex parte Perkins, 920 So. 2d 599 (Ala. Crim. App. 2005), a Rule 32 petitioner was granted discovery to perform new testing on blood and fingerprint evidence, in order to support his claim that his counsel had been ineffective for not requesting such testing at trial.

In each of these cases, the initial Rule 32 discovery request was supported either by other new evidence already in hand (the purported confession in Arthur), or by related constitutional claims (e.g., ineffective counsel in Perkins). Because Rule 32 petitions usually assert multiple grounds for relief, there is apparently no case in which an Alabama court has granted discovery on a Rule 32 petition whose

and denied Arthur's petition. Final Order Denying Petitioner Thomas D. Arthur's Amended Successive Rule 32 Petition for Post-Conviction Relief, Arthur v. State, Case No. CC 87-577.62, at *9 (Jefferson County Cir. Ct., Sept. 1, 2009).

<u>sole</u> basis was that new forensic testing might uncover evidence of innocence. However, nothing in the decisions we have found compels Cunningham's conclusion that a stand-alone claim would fail as a matter of law at the pleading stage.

### 2. Cunningham's Contentions and Arguments

Recognizing that the Supreme Court has approved Alaska's procedures, Cunningham makes great efforts to distinguish them from Alabama's. He argues that Alabama's process is facially inadequate because, unlike Alaska's, it "categorically" forecloses any possibility of postconviction access to DNA evidence in non-capital cases. It is essential to Cunningham's argument that this Court find Alabama's process inadequate <u>on its face</u>, not just as it might apply to his particular case, because only then can his failure to properly pursue state-law remedies be excused. <u>Osborne</u> held that, where state procedures for postconviction relief were adequate on their face, a claimant could not challenge their application in practice until he had actually tried them. 129 S. Ct. at 2321. That holding applies even more strongly in this case than it did in <u>Osborne</u> itself, where there was some disagreement about how thoroughly Osborne had pursued state-law remedies. <u>See</u> 129 S. Ct. at 2333 & n.5 (Stevens, J., dissenting). Here, it is undisputed that in neither of his two previous Rule 32 petitions did Cunningham

ever raise the DNA issue, nor did he otherwise ask a state court to order testing. Instead, he made a series of out-of-court requests to various authorities to release the evidence, and they refused to do so without a court order. Cunningham's counsel admitted at oral argument that they never sought an order from a state court; he said that, as he understood Alabama law, such a request was procedurally impossible.

In order to have a chance of prevailing, then, Cunningham must show that Alabama's procedures are so inadequate on their face that—unlike Alaska's—they do not satisfy Osborne's requirement of fundamental fairness. This is a difficult showing to make. Even the dissenters in Osborne did not dispute the facial adequacy of Alaska's statute, but instead found fault with how the state courts had applied it in that case. See id. at 2332 (Stevens, J., joined by Ginsburg, J., Breyer, J., and Souter, J., dissenting) (agreeing that the statute was "not facially deficient" but questioning whether the procedures were fundamentally fair "in their operation"); id. at 2343 (Souter, J., dissenting) (describing Alaska's process as "facially reasonable" but finding procedural unfairness in its handling of Osborne's case).

To support his claim of facial inadequacy, Cunningham makes two arguments. He first points to Alabama's recently enacted statute providing for

66

postconviction DNA testing in capital cases and contends that it somehow

prohibits testing in non-capital cases.  <u>See</u> Ala. Acts 2009, No. 2009-768, § 1

(effective Aug. 1, 2009), codified at Ala. Code 1975 § 15-18-200.  That statute

allows a capital defendant to bring a "motion for DNA testing" based on actual

innocence.  <u>Id.</u> § 200(a)–(b).  If the motion is granted and the test produces an

exculpatory result, the defendant can then move under Ala. R. Crim. P. 32 to have

his conviction vacated.  <u>Id.</u> § 200(h)(2).[16]  Because it applies only to capital

defendants, Cunningham argues that the new statute constitutes a "deliberate

policy choice" by Alabama to deny evidence for DNA testing in non-capital cases

such as his own.  We are not persuaded.  The statute does not address non-capital

cases at all, and nothing in its language suggests any legislative intent to restrict or

eliminate existing possibilities for non-capital defendants to seek discovery under

Rule 32.  The legislature might well have thought that death penalty cases had a

---

[16] The new statute imposes conditions that must be satisfied before capital defendants can obtain DNA testing.  The claimant must offer a "clear and specific" statement, under penalty of perjury, of how the testing can prove his factual innocence.  <u>Id.</u> § 200(e)(1).  The identity of the perpetrator must have been at issue at trial, such that an exculpatory DNA result would demonstrate innocence.  <u>Id.</u> § 200(e)(3).  The evidence must have remained in a secure chain of custody, <u>id.</u> § 200(f)(1)(b), and must be in a condition such that testing can produce "accurate and reliable results."  <u>Id.</u> § 200(c)(1).  Either the evidence itself or the technology for the test must not have been available at trial.  <u>Id.</u> § 200(e)(2)(b).  The evidence must not previously have been subjected to any kind of DNA testing, or the new test must be capable of resolving an issue which previous tests could not.  <u>Id.</u> § 200(c)(2).  These requirements are similar to limitations imposed by other DNA-testing statutes mentioned favorably in <u>Osborne</u>.  <u>See</u> 129 S. Ct. at 2317.

more urgent claim on its attention and warranted more explicit and specific procedures, while leaving the procedure in non-capital cases to the courts to develop.

Cunningham also contends that it is impossible to obtain DNA testing through the existing discovery provisions of Rule 32, which is Alabama's general postconviction relief provision. He argues that a request for DNA testing cannot succeed because Rule 32 requires that a petitioner already have evidence of innocence before he can state a claim and obtain discovery of evidence for DNA testing to show his innocence. Rule 32.1(e) allows a convict to "institute a proceeding" to secure relief "on the ground that . . . [n]ewly discovered material facts exist" which require that the conviction be vacated. Ala. R. Crim. P. 32.1(e) (emphasis added). According to Cunningham, the word "exist" creates a Catch-22 requirement that he must already have exculpatory test results (the "newly discovered material facts") before he can state a claim under Rule 32 that would entitle him to evidence that would lead to exculpatory test results. The State disagrees and assured us at oral argument that Rule 32's language merely states a pleading requirement under which a claimant can allege facts that if true would entitle him to relief, and then can obtain discovery to prove those facts.

The only support in case law for Cunningham's interpretation of Rule

32.1(e) is Judge Shaw's concurrence in the Court of Criminal Appeals decision in

Dowdell:

> [U]nder existing Alabama caselaw and court rules, Dowdell is subject to a true "catch-22" . . . .  [Dowdell] could not have possibly stated a proper claim under Rule 32.1(e), because he had no DNA test results upon which to base such a claim for relief.  Yet he also could not discover the evidence he needs, i.e., the DNA test results, because without those results he could not state a facially valid claim under Rule 32.1(e).

854 So. 2d at 1200, 1202 (Shaw, J., concurring in result).

Judge Shaw based his understanding of Rule 32.1(e) on the Alabama

Supreme Court's admonition in Land that postconviction discovery "is not a

device for investigating possible claims, but a means of vindicating actual claims."

Id. at 1201 (quoting Land, 775 So. 2d at 852 (citations and quotation marks

omitted)).  However, Land does not support Cunningham's Catch-22 argument but

instead rebuts it.  Land, a death-row inmate, claimed that his counsel had been

ineffective for not investigating or presenting evidence of mitigating

circumstances at his sentencing, and he sought discovery of his correctional,

psychiatric, and juvenile records in order to establish that such mitigating evidence

would have been available.  775 So. 2d at 849; cf. Ala. R. Crim. P. 32.6(b) (setting

pleading standards for a Rule 32 claim asserting a violation of constitutional

69

rights). The State opposed discovery on the ground that Land had not shown that the documents he sought actually contained any such evidence. Id. at 853. The Alabama Supreme Court rejected the State's argument as "without merit," noting that "[u]ntil the documents are actually produced, it is impossible to determine whether they contain evidence of mitigating circumstances." Id. at 854. In any event, six years after Judge Shaw interpreted Land's language as imposing a Catch-22 barrier to requests for DNA testing, the Alabama Supreme Court clarified that the "good cause" standard simply requires a Rule 32 petitioner to present a "facially meritorious" claim by alleging facts that, if proven, would entitle him to relief. Ex parte Turner, 2 So. 3d 806, 812 (Ala. 2008).

Even before the Turner decision clarified what Land meant, a majority of the judges on the Court of Criminal Appeals rejected Judge Shaw's interpretation of it. See Dowdell, 854 So. 2d at 1198 ("Had Dowdell filed his petition within a reasonable time . . . we would have considered the merits of his petition. . . ."). The implications of the majority's statements in Dowdell, and the explicit effect of the State's assertion now, is that the "newly discovered material fact" whose existence must be alleged at the time the petition is filed is the availability of a new form of testing that could, given the circumstances of the case, conclusively establish innocence, not the actual results of the yet-to-be-performed test. See also

70

Barbour, 903 So. 2d at 867 n.6 ("Barbour's claim is . . . that significant, recent technological developments would exonerate him.").

Cunningham is not the only one who has made this argument against a state's evidentiary discovery procedures. Osborne made the same Catch-22 argument. The relevant language in Alaska's statute was substantially identical to that in Rule 32.1(e). See Alaska Stat. § 12.72.010(4) (a defendant may seek relief if he claims that "there exists evidence of material facts" requiring vacation of his conviction (emphasis added)). Osborne, like Cunningham, complained that the language of the provision created a Catch-22, putting him in the impossible situation of needing to know what the tests would show before he could have them done.[17] The State of Alaska responded, as Alabama does here, that the statute merely imposed a pleading requirement under which a claimant could allege facts

_____

[17] See Transcript of Oral Argument at 35, Osborne, 129 S. Ct. 2308 (No. 08-6):

JUSTICE SCALIA: They have a procedure for [state] habeas corpus which includes discovery, and all he has to do is come in and say, you know, I have been wrongfully convicted; I am innocent; and I want to discover this evidence in order to establish it, so that I can get out of jail.

MR. NEUFELD [for Osborne]: That contradicts the position they took in the—in the State court, Your Honor. They specifically said in the State courts that it is not enough to simply assert one's innocence; that you actually have to have proofs, facts that—that demonstrate your innocence before you get to that discovery. It is a Catch-22 situation. (emphasis added).

71

and then obtain discovery to prove them.[18]  Osborne's state-court action had

foundered on grounds of timeliness and diligence, not because of any Catch-22.

See Osborne, 110 P.3d at 995.  Although the Ninth Circuit picked up Osborne's

Catch-22 line, 521 F.3d at 1129, the Supreme Court did not find it persuasive.

Consistent with the State's representation to this Court at oral argument, an

Alabama Court of Criminal Appeals majority appears to recognize that a properly

presented Rule 32 petition may be used to seek discovery of physical evidence for

DNA testing.  See Dowdell, 854 So. 2d at 1198.  Nothing in Alabama's case law

on postconviction discovery holds otherwise.  Although the Alabama Supreme

Court has not yet directly addressed this issue, we take the State at its word.  Not

only that, but any uncertainties about how Alabama courts might handle requests

for DNA testing under Rule 32 must be resolved against Cunningham because

Osborne places the burden on him to demonstrate that Alabama's procedures are

inadequate.  See 129 S. Ct. at 2321.  And he is the one who failed to give them a

---

[18] See id. at 64–65:

JUSTICE GINSBURG: But you—you referred to the civil rules, and in discovery, in criminal cases as in civil cases, it—ordinarily you have to prove that you have a basis for a claim. Like you don't get on the civil side discovery before you can pass the 12(b)(6) threshold that you have stated a claim.  Are you giving that up here? Because he's seeking the discovery but he hasn't established that he has a tenable claim.

MR. ROSENSTEIN [for the State]: Justice Ginsburg, Mr. Osborne, by filing an affidavit that would accompany his application, that would—I think that would operate to state a claim.

try. We conclude that Alabama's procedures, like Alaska's, are adequate on their face to satisfy fundamental fairness under the standard set by Osborne.

### 3. Why Cunningham's Rule 32 Petition May Fail

We emphasize that we are not suggesting Cunningham would be successful in obtaining the evidence he seeks if he presented his claim for it in a Rule 32 petition. That would be for the state courts to decide. Due process requires only that a remedy be available, not that Cunningham succeed in obtaining it. What the Supreme Court said of Osborne applies equally here: "If he simply seeks the DNA through the State's discovery procedures, he might well get it. If he does not, it may be for a perfectly adequate reason. . . ." 129 S. Ct. at 2321. If Cunningham were to file a Rule 32 petition now, he could satisfy Rule 32.6(b)'s requirement of a "clear and specific" statement of the grounds and an alleged factual basis for relief. His request in this lawsuit is narrowly focused on three pieces of physical evidence, and he has spelled out precisely what he believes the testing might prove. However, a review of Rule 32 suggests Cunningham would face several other serious and possibly insurmountable procedural hurdles.

If a Rule 32.1(e) petition based on newly discovered material facts is presented more than one year after conviction, it must be filed within six months of the discovery of those facts. Ala. R. Crim. P. 32.2(c). Assuming that the

availability of a new form of testing constitutes a "new fact" within the meaning of the statute, Rule 32.2(c) would seem to require that Cunningham's claim have been brought within six months of whenever STR-DNA testing became reasonably available for the particular use he proposes. When exactly that was is unclear, but it was certainly more than five years ago. The specific idea of testing the pubic hairs in this case was broached at least as early as August 2004, when the Wisconsin Innocence Project began contacting authorities to request access to that evidence. Arguably, then, Cunningham should have filed a Rule 32 petition to seek DNA testing on the hairs no later than February 2005.[19]

Rule 32.1(e)(1) also requires that the "new facts" had not yet been known in time to be included in any previous collateral proceeding and could not have been discovered by that time through reasonable diligence. Cunningham filed two previous Rule 32 petitions, in December 1999 and October 2003, and in neither of those did he request any form of DNA testing. If the testing he now seeks were available at either of those times, it probably would not qualify as "new" in any future Rule 32 petition.

---

[19] The Wisconsin Innocence Project requested the condom wrapper for testing in December 2004, so a Rule 32 petition seeking that evidence should have been filed by June 2005.

Alabama courts have applied these requirements to deny relief. See, e.g., Dowdell, 854 So. 2d at 1197–98 (denying Rule 32 petition as untimely where requested testing had been available for more than ten years, and petitioner's claim that he had only recently learned about DNA was not credible); McHarris v. State, 623 So. 2d 400, 401 (Ala. Crim. App. 1993) (dismissing Rule 32 petition because it failed to allege it had been filed within six months of discovery of new witness statement). Other states impose similar timeliness and diligence requirements on the presentation of new evidence to support postconviction claims of innocence, and the Supreme Court has indicated that such limitations are "not inconsistent" with fundamental fairness. See Osborne, 129 S. Ct. 2320–21 (citing examples).

There is another requirement. To qualify as a "[n]ewly discovered material fact" for purposes of Rule 32.1(e), evidence must not only be "new" in the chronological sense but it must also satisfy the materiality element of the definition. It must "establish that the petitioner is innocent," 32.1(e)(5), and must do so to a sufficiently compelling degree that the "result probably would have been different" if the evidence had been presented at trial. 32.1(e)(4). In Barbour the availability of new DNA testing did not count as a "newly discovered fact" even though the petition was timely; the reason is that DNA results would not have been probative of innocence in a case where the petitioner had been

75

convicted only as an accomplice. 903 So. 2d at 867; see also McKinney v. State, CR-07-1983, 2009 WL 1497093 (Ala. Crim. App. May 29, 2009) (affirming trial court's judgment based on finding that blood evidence sought by petitioner for forensic testing was not "newly discovered" under Rule 32.1(e), because results would not be probative where petitioner had admitted killing the victim but had claimed self-defense).

In Cunningham's case, the State would no doubt argue (as it has in this Court) that he cannot satisfy Rule 32.1(e)(5) because the testing he requests would not be capable of providing compelling proof of innocence, given that the condom wrapper has probably not been kept in a sterile environment, and that it is not even certain that the pubic hairs recovered from the victim came from the rapist. The response of the State to the request for fingernail scrapings may depend on whether any still exist.

Alabama case law offers no guidance about whether a request for forensic testing would satisfy Rule 32.1(e)(5)'s materiality requirement in a situation where a conclusive exculpatory result is theoretically possible but is improbable given the condition of the biological samples and the overall weight of other evidence of guilt. The Supreme Court in Osborne did not consider whether the "materiality" requirements it generally endorses, 129 S. Ct. at 2320–21, could properly be

76

applied to refuse testing in such circumstances. Because no Alabama court has had the opportunity to consider Cunningham's claim, we need not decide whether such an application of Rule 32's materiality requirement would violate due process in his case.

Of course, if Cunningham does file a Rule 32 petition to obtain the evidence he seeks, it will be for the Alabama courts to decide that petition and how the various procedural requirements apply. We have described those requirements only to make it clear that our decision today is not predicated on a prediction that Cunningham will succeed in obtaining the evidence in a future Rule 32 proceeding. That he may not does not affect our decision.

In summary, Cunningham has failed to show that Alabama's mechanism for postconviction relief is inadequate on its face under <u>Osborne</u>'s fundamental fairness standard, and he cannot complain about its application to the facts of his case when he has not attempted to invoke it. <u>See</u> <u>Osborne</u>, 129 S. Ct. at 2321. Therefore, Cunningham's due process claim fails.

### D. The Access to Courts Claim

Cunningham also argues that postconviction access to the biological evidence is necessary to vindicate his constitutional right of access to the courts, a claim that was not considered in <u>Osborne</u>. "It is now established beyond a doubt

77

that prisoners have a constitutional right of access to the courts" under the Due Process Clause. Bounds v. Smith, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494 (1977). That access must be "adequate, effective, and meaningful." Id. at 822, 97 S. Ct. at 1495. In order to establish a violation of the right of access to the courts, however, a prisoner must show an actual injury. See Lewis v. Casey, 518 U.S. 343, 349, 116 S. Ct. 2174, 2179 (1996). That requirement derives from the constitutional doctrine of standing. Id.; see also Christopher v. Harbury, 536 U.S. 403, 415, 122 S. Ct. 2179, 2186–87 (2002) (recognizing that the right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court"). The injury requirement reflects the fact that "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Christopher, 536 U.S. at 414–15, 122 S. Ct. at 2186.

The injury requirement means that the plaintiff must have an underlying cause of action the vindication of which is prevented by the denial of access to the courts. See id. at 415, 122 S. Ct. at 2187 ("[T]he underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation."). The allegations about the underlying cause of action must be specific enough to give fair notice to the

defendants and must "be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." Id. at 416, 122 S. Ct. at 2187.

Cunningham originally identified four possible causes of action that he alleged he was unable to pursue because of the defendants' actions: (1) a claim for a new trial in state court based on newly discovered evidence under Alabama's Rule 32; (2) a claim under Herrera v. Collins, 506 U.S. 390, 113 S. Ct. 853 (1993), that he is innocent and, therefore, is imprisoned in violation of due process; (3) a "gateway" claim under Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851 (1995), that would allow him to use evidence of innocence to revive otherwise procedurally barred constitutional claims in a federal habeas action; and (4) an application for state clemency or pardon.

Because the Supreme Court has made clear that Herrera is not a basis for obtaining DNA testing in a § 1983 action, see Osborne, 129 S. Ct. at 2321–22, and this Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases, see Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007), Herrera cannot support an access to courts claim. Because there is no constitutional right to state clemency proceedings, see Osborne, 129 S. Ct. at 2319, that cannot be a basis for an access to courts claim

79

either. So, Cunningham's second and fourth posited causes of action will not support an access to courts claim.

The other two posited causes of action do not fare any better. The first one of them is the claim that the asserted inadequacy of Alabama's procedures for postconviction relief and the refusal of the authorities to give him the evidence for testing have prevented him from seeking a new trial in Alabama state court. In other words, Alabama's Rule 32 creates the underlying cause of action for a new trial on the basis of newly discovered evidence, and the State is interfering with his right of access to its courts to obtain that new trial by impeding his access to the necessary evidence. As Cunningham recognizes, his argument here essentially mirrors his Osborne-based procedural due process claim.

Because it does, the State responds that since Cunningham has not properly invoked Alabama's procedures, he cannot complain that Alabama has denied him access to its courts. See Lewis, 518 U.S. at 351, 116 S. Ct. at 2180 (litigant must demonstrate that shortcomings in the process "hindered his efforts" to pursue a legal claim). This argument reflects Osborne's holding that where a state's procedures are facially adequate, a claimant cannot challenge their application to his particular case on due process grounds until he has actually attempted to use those procedures. See 129 S. Ct. at 2321. Because we have concluded that

Alabama's mechanism for postconviction relief is consistent with due process under <u>Osborne</u>'s fundamental fairness standard, it follows that it does not improperly interfere with Cunningham's right of access to the courts. Furthermore, the defendants' out-of-court refusal to release evidence for DNA testing in no way prevents Cunningham from asking a state court to order release of that evidence.

In reaching this conclusion, we reiterate that we do not imply that Cunningham will ultimately succeed in obtaining access to the biological evidence through a Rule 32 petition. For reasons we have already discussed, a Rule 32 petition from him would face tough procedural hurdles. Whether Cunningham could clear those hurdles is a question we need not decide. If, for example, he is denied discovery because his request is untimely under Rule 32.2(c), or if—having already filed two previous petitions that never requested DNA testing—he cannot satisfy the successive petition requirements in Rule 32.2(b), it will be his own omissions and not the actions of the defendants that foreclosed his ability to seek a new trial in state court. That is not a violation of his right of access to the courts.

Cunningham's only remaining attempt to satisfy the actual injury requirement by showing a potentially viable cause of action is his assertion that by refusing to turn over the evidence the defendants have prevented him from

showing actual innocence as a "gateway" claim in a federal habeas action under Schlup, 513 U.S. 298, 115 S. Ct. 851. Under Schlup a showing of actual innocence "does not by itself provide a basis of relief." Id. at 315, 115 S. Ct. at 861. Instead, it is merely "a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits." Id. (quotation marks omitted). Under Schlup, Cunningham "may obtain review of his constitutional claims only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" Id. at 314–15, 115 S. Ct. at 861 (citation omitted). To do that, he must establish that his conviction was the result of a constitutional violation and but for that constitutional violation, "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327, 115 S. Ct. at 867.

One problem with Cunningham's reliance on Schlup as an underlying basis for an access to courts claim is that his complaint fails to specify any constitutional claims—viable or otherwise—that he could raise in federal court if he were able to overcome the procedural obstacles to filing a new habeas petition. Cunningham's assertion of actual innocence, by itself, is not enough. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation

82

occurring in the underlying state criminal proceeding." Herrera, 506 U.S. at 400, 113 S. Ct. at 860; see Mize v. Hall, 532 F.3d 1184, 1195 (11th Cir. 2008); Brownlee v. Haley, 306 F.3d 1043, 1065 (11th Cir. 2002). We have already concluded that Cunningham has suffered no violation of his due process rights in relation to his attempts to seek evidence for DNA testing. A Schlup claim would need to allege an arguably viable constitutional claim independent from the issue of access to DNA evidence, and Cunningham has not done so here. In order to satisfy the actual injury requirement for an access to courts claim, Cunningham's complaint must describe the underlying cause of action in specific enough terms to give the defendants fair notice and to satisfy "the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." See Christopher, 536 U.S. at 416, 122 S. Ct. at 2187. The complaint in this case fails to identify a single constitutional claim that could be raised in conjunction with a Schlup gateway claim and, therefore, does not adequately plead an actual injury.

Another reason why Cunningham's Schlup theory is not an adequate basis for an access to courts claim is that the state defendants in this case have not actually done anything to block Cunningham from bringing a Schlup-based federal

83

habeas proceeding.[20]   They have simply refused to do something that might help

bolster his chances of success in a federal habeas action, and the doctrine of right

of access to the courts imposes no such duty on them.  Cf. Lewis, 518 U.S. at 354,

116 S. Ct. at 2181 (disclaiming any suggestion that the state must enable a

prisoner "to discover grievances, and to litigate effectively once in court").  In

Chappell v. Rich, 340 F.3d 1279 (11th Cir. 2003), this Court found no violation of

the right of access to the courts where defendants had concealed evidence that

might have strengthened plaintiffs' claims in a wrongful death suit, since they had

done nothing to prevent such a suit from being filed.  Id. at 1283–84; see also

Harvey v. Horan, 278 F.3d 370, 386 (4th Cir. 2002) (King, J., concurring in part

and concurring in the judgment) (concluding that Virginia's refusal to release

evidence for DNA testing did not violate the claimant's right of access to the

_____

[20]   This is not to suggest, of course, that Cunningham would succeed if he did bring one. The procedural barriers he would face in federal habeas—even if he could state a cognizable constitutional claim—are more onerous than those imposed by Alabama's Rule 32.  Since Cunningham has already filed five federal habeas petitions, he would need to meet the heightened burden of showing clear and convincing evidence of innocence before he could get through the gateway.  See 28 U.S.C. § 2244(b)(2)(B)(ii) (setting higher standard for second or successive petitions).  Furthermore, such evidence would need to show not only that he was innocent but also that his conviction resulted from "constitutional error."  Id.; see Schlup, 513 U.S. at 315–16, 115 S. Ct. at 861–62.  As the Supreme Court has observed, Schlup sets a "demanding" standard that will be met only in "extraordinary" cases.  House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006).

courts, because <u>Lewis</u> did not require the State "to help [him] bolster any such future" claims).

Under <u>Christopher</u>, courts must apply "the 'nonfrivolous' test" and determine whether "the 'arguable' nature of the underlying claim is more than hope." 536 U.S. at 416, 122 S. Ct. at 2187. We agree with the district court that Cunningham's <u>Schlup</u> claim does not satisfy the actual injury requirement, because there is only a "hope"—and not a well-grounded one—that the DNA testing he seeks could provide sufficiently strong evidence of innocence to meet the demanding <u>Schlup</u> standard.

Because none of Cunningham's four proffered causes of action meets the actual injury requirement, he cannot establish a violation of his right of access to the courts.

## VI. Conclusion

Cunningham received a fair trial more than a decade ago. He has already challenged his conviction on direct appeal and collaterally through two Rule 32 petitions in state court and five habeas petitions in federal court. Neither of his Rule 32 petitions requested access to biological evidence for DNA testing. And only one of the five federal habeas petitions Cunningham filed even mentioned DNA testing—making just a "broad conclusory argument that such testing may

exculpate him." (R16:Tab 4: Rep. & Rec. at 14 n.5). Not having attempted to invoke the state procedures available to him for access to DNA evidence, Cunningham cannot say that those facially valid procedures are so inadequate that they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or "transgress[] any recognized principle of fundamental fairness in operation." Osborne, 129 S. Ct. at 2320 (quotation marks and citations omitted). Nor can he say that the defendants' actions have interfered with his right of access to the courts. Cunningham has not, under the circumstances of this case, established any violation of his constitutional rights. Accordingly, we affirm the district court's judgment dismissing his complaint.

    **AFFIRMED.**